Mary K.S. OGDEN,
Petitioner-Appellant,

v.

COMMISSIONER OF INTERNAL
REVENUE, Respondent-Appellee.

No. 85–4476.

United States Court of Appeals,
Fifth Circuit.

April 25, 1986.

Rehearing Denied May 27, 1986.

---

14. *Matte,* at 630.

15. *See contra Simmons v. Hoegh Lines,* 784 F.2d 1234, 1236–37 (5th Cir.1986).

Robert G. Jackson, Baton Rouge, La., petitioner-appellant.

Fred T. Goldberg, Jr., Chief Counsel, IRS, Glenn L. Archer, Jr., Asst. Atty. Gen., Tax Div., U.S. Dept. of Justice, Michael L. Paup, Chief, Appellate Sec., David English Carmack, Steven I. Frahm, Roger M. Olsen, Attys., Washington, D.C., for respondent-appellee.

Before REAVLEY, RANDALL and DAVIS, Circuit Judges.

PER CURIAM:

AFFIRMED on the basis of the Tax Court opinion, *Ogden v. Commissioner*, 84 T.C. 871 (1985), a copy of which is attached hereto.

84 T. C. No. 57

UNITED STATES TAX COURT

MARY K. S. OGDEN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22866–82                    Filed May 16, 1985.

SIMPSON, Judge:

The Commissioner determined a deficiency of $26,814.54 in the petitioner's Federal income tax for 1978. The issues for decision are: (1) Whether a special allocation to the petitioner under a partnership agreement had substantial economic effect within the meaning of section 704(b)(2) of the

Internal Revenue Code of 1954,[1] and (2) if such special allocation lacked substantial economic effect, what was the petitioner's interest in the partnership, within the meaning of section 704(b), for purposes of redetermining her distributive share of loss from the partnership.

All of the facts have been stipulated, and those facts are so found.

The petitioner, Mary K.S. Ogden, resided in Lafayette, La., at the same time she filed her petition in this case. She filed her Federal income tax return for 1978 with the Internal Revenue Service Center, Austin, Tex.

The petitioner was admitted to the Riverside Investment Jackson Partnership (Riverside)[2] on November 14, 1978. Riverside was originally organized in January 1977 as a joint venture of four individuals, Robert G. Jackson, Charles B. Harvey, Sr., John C. Yemelos, and Huey J. Wilson. The venture was formed to make secured loans on a real estate development in Baton Rouge, La., known as Corporate Square, and to own and operate various other real properties. In January 1977, Riverside lent a total of $2 million to four partnerships involved in the Corporate Square development (the Corporate Square partnerships). Riverside obtained the funds loaned to the Corporate Square partnerships by borrowing $2 million from American Bank and Trust Company of Baton Rouge (American Bank). The loan from American Bank to Riverside was guaranteed by the four members of the joint venture; the men

agreed among themselves that each would guarantee the following portions of the debt:

| Robert G. Jackson | $600,000 |
| Charles B. Harvey, Sr. | 400,000 |
| John C. Yemelos | 600,000 |
| Huey J. Wilson | 400,000 |

During 1977, Mr. Wilson withdrew from Riverside, and the guarantees for the $2 million debt were restructured in order to hold Mr. Wilson harmless from liability. Rolfe H. McCollister and Mr. Jackson agreed to assume liability for that portion of the debt guaranteed by Mr. Wilson. However, Mr. McCollister did not become a member of Riverside until July 14, 1978.

On December 30, 1977, Riverside was converted from a joint venture to a partnership in commendam under Louisiana law, which is equivalent to a limited partnership for Federal tax purposes. In return for capital contributions consisting of their continuing guarantees of the debt owed to American Bank, Mr. Jackson became the partnership's general partner and Mr. Harvey and Mr. Yemelos became Class A partners in commendam, which are equivalent to limited partners. Four new partners were also admitted into the partnership as Class B partners in commendam. The partners executed a written partnership agreement, which stated that the partners' respective capital contributions and interests in partnership stock[3] were as follows on December 30, 1977:

---

1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue.

2. The name of the partnership was changed on several occasions in 1977 and 1978. For convenience, we shall refer to it as "Riverside" throughout this opinion.

3. Under the partnership agreement executed by the partners, the partners received a percentage

ownership interest in "partnership stock" in return for their capital contributions; "partnership stock" was defined as the "cash or other property contributed or furnished to the Partnership by a Partner as set out in Article 2808 of the Revised Civil Code of Louisiana and other applicable law, as amended." The parties have stipulated that an ownership interest in partnership stock was equivalent to a "capital interest" in the partnership.

| General Partners | Contribution to Partnership Stock | Interest In Partnership Stock | |
|---|---|---|---|
| Robert G. Jackson | continuing guaranty on $1 million of partnership debt | 45.875% | |
| Total | | ———— | 45.875% |
| **Class A Partners** | | | |
| Charles B. Harvey, Sr. | continuing guaranty on $400,000 of partnership debt | 18.350% | |
| John C. Yemelos | continuing guaranty on $600,000 of partnership debt | 27.525% | |
| Total | | | 45.875% |
| **Class B Partners** | | | |
| Roland M. Toups | $ 56,000 | 2.06% | |
| H. Alva Brumfield, III | 50,000 | 1.84% | |
| Murry A. Decoteau | 68,400 | 2.51% | |
| Laurence de la Bretonne | 50,000 | 1.84% | |
| Total | $224,400 | | 8.25% |
| Grand Total | | | 100.00% |

Riverside's loan to the Corporate Square partnerships became uncollectible in 1978, when three of the partnerships instituted bankruptcy proceedings and were discharged of all debts by order of the Bankruptcy Court, dated May 25, 1978. The bankruptcy court determined that a secured indebtedness due and owing to Chemical Bank of New York exceeded the value of the debtors' properties, leaving no equity or value in and to such properties for any other secured or unsecured creditor. Under the distribution schedule filed with that court on July 18, 1978, Riverside's claim of $2,297,926.60 was relegated to that of general, unsecured creditor.

Sometime between May 15 and June 1, 1978, Riverside proposed to buy from Chemical Bank and its affiliates the three pieces of real property owned by the bankrupt partnerships. In order to finance the acquisition of the properties, Riverside admitted 23 new Class C partners in commendam on July 14, 1978; but when the partnership was unable to obtain bank financing for the purchase of the bankrupts' properties, the purchase agreement with Chemical Bank fell through, and the partnership was forced to return to nine of the new partners their entire capital contributions, plus interest and the expenses incurred by each partner in connection with his investment. Fourteen of the newly admitted partners chose to remain in the partnership as Class C partners in commendam, and Mr. McCollister was admitted to the partnership as a Class A partner in commendam. The record does not clearly indicate what the partners' partnership stock interests were during the period of July 14 to November 13, 1978.

Sometime after July 14, 1978, Riverside made plans to purchase two other unrelated properties in Baton Rouge: an office building known as the I–12 Office Center and an apartment complex named Batture Apartments. To effect the purchase of these properties, the partnership admitted five additional Class C partners in commendam on November 14, 1978. The petitioner was one of the partners admitted at such time. She contributed $35,600 in cash and a note in return for a 2-percent interest in partnership stock. At this time, Mr. McCollister's interest in the partnership was converted from that of a Class A partner in commendam to that of a general

partner. According to Riverside's partnership agreement, as amended on November 14, 1978, to reflect the admission of the new partners, the partners had made capital contributions to, and possessed stock ownership interests in, the partnership as follows:

| | Contribution to Partnership Stock | Interest In Partnership Stock |
|---|---|---|
| General Partners (Jackson, McCollister) | $2,430,750 | 30.00% |
| Class A Partners (Harvey, Yemelos) | 60,000 | 2.00% |
| Class B Partners (Toups, Brumfield, Decoteaus, de la Bretonne) | 274,400 | 18.00% |
| Class C Partners (18 partners, including Mary K. S. Ogden and 4 other newly admitted partners) | 797,150 | 44.75% |
| Class C units[4] unsubscribed | —— | 5.25% |
| Total | | 100.00% |

On November 14, 1978, Riverside acquired the Batture Apartments and the I–12 Office Center.

The Class C units which went unsubscribed in November were acquired on December 15, 1978, by William Champ Emerson, an existing Class C partner in commendam, who increased his interest in partnership stock from 18.50 percent to 22.50 percent, and by Terence McCoy, who was admitted as a new Class C partner in commendam with a 1.25-percent interest in the partnership. After the subscription of those Class C units, the capital contributions of the Class C partners in commendam totaled $890,000, and their ownership interests in partnership stock totaled 50 percent; the stock ownership interests of the general, Class A, and Class B partners remained as they were on November 14, 1978.

On December 13, 1978, the $2 million debt owed by Riverside to American Bank was extinguished as a result of payments previously made by the following persons in the designated amounts:

| Date of Payment | Payor | Amount |
|---|---|---|
| 8/22/78 | Huey J. Wilson | $ 400,000 |
| 9/15/78 | John C. Yemelos | 480,000 |
| 9/15/78 | (unknown) | 120,000 |
| 9/19/78 | Robert G. Jackson | 573,000 |
| 9/20/78 | Rolfe H. McCollister | 27,000 |
| 12/13/78 | Charles B. Harvey, Sr. | 400,000 |
| | Total | $2,000,000 |

With the exception of the payments from the unknown source and from Mr. McCollister, all of the payments to American Bank were funded by personal loans incurred by the listed payors.

On its partnership return of income for 1978, Riverside reported a net loss of $2,600,492.54, which included a bad debt deduction of $2,140,791.37 for the debt owed to Riverside by the Corporate Square partnerships. Upon audit of the partnership return by the Internal Revenue Service, the net loss was reduced to $2,577,536.00 as a result of the disallowance of $22,956.00 of expense deductions. Riverside and the petitioner agree with the adjustment to the partnership loss.

Because Riverside experienced variations in partnership interests in 1978 due to the admissions of new partners on July 14,

**4.** Under the Riverside partnership agreement, a "unit" was defined as a .5-percent ownership right of a partner in commendam in and to partnership stock.

November 14, and December 15, the partnership divided the year into four periods of unequal length and prorated its total loss for the year to such periods on the basis of the number of days in each period. The Commissioner does not object to Riverside's method of accounting for the partners' varying interests, but he has recomputed the allocation using the redetermined partnership loss of $2,577,536. The four periods and the amount of loss allocated to each period by the Commissioner are as follows:

| Period | Pro Rata Allocation as Redetermined [5] |
|---|---|
| First period— 1/1/78–7/13/78 (194 days) | $1,369,977.73 |
| Second period— 7/14/78–11/13/78 (123 days) | 868,595.00 |

| Period | Pro Rata Allocation as Redetermined [5] |
|---|---|
| Third period— 11/14/78–12/13/78 (30 days) | 211,852.27 |
| Fourth period— 12/14/78–12/31/78 (18 days) | 127,111.00 |
| | $2,577,536.00 |

The petitioner agrees with the prorated allocation as redetermined by the Commissioner.

Riverside's partnership agreement was amended again on December 15, 1978, upon the subscription of the last Class C units, to provide in Article 8.02 thereof that partnership items of income, gain, loss, deduction, and credit were to be allocated among the partners in accordance with the following scheme for the designated years:

| | 1978 | | | | 1979–1983 |
|---|---|---|---|---|---|
| | First Period | Second Period | Third Period | Fourth Period | |
| **General Partners** | | | | | |
| Robert G. Jackson | 87.26% | —0— | —0— | —0— | .25% |
| Rolfe H. McCollister | —0— | —0— | —0— | —0— | .25% |
| Total | 87.26% | —0— | —0— | —0— | .50% |
| **Class A Partners** | | | | | |
| Charles B. Harvey, Sr. | 4.29% | —0— | —0— | —0— | .25% |
| John C. Yemelos | .60% | —0— | —0— | —0— | .25% |
| Total | 4.89% | —0— | —0— | —0— | .50% |
| **Class B Partners** | | | | | |
| Roland M. Toups | 5.71% | —0— | —0— | —0— | 7.49% |
| H. Alva Brumfield | —0— | —0— | —0— | —0— | 6.68% |
| Murry A. Decoteau | —0— | —0— | —0— | —0— | 9.15% |
| Laurence de la Bretonne | 2.14% | —0— | —0— | —0— | 6.68% |
| Total | 7.85% | —0— | —0— | —0— | 30.00% |
| Class C Partners | | | | | 69.00% [6] |
| Partners admitted 7/14/78 | —0— | 100.00% | 57.25% | —0— | |
| Partners admitted 11/14/78 | —0— | —0— | 42.75% | —0— | |
| Partners admitted 12/15/78: | | | | | |

---

5. The parties stipulated to figures which differed by a few cents from the figures appearing in this column and which also did not add up to the total, $2,577,536. We have corrected such figures based on the contents of the stipulated exhibits and by "rounding" certain figures.

6. For the years 1979 through 1983, 69 percent of the partnership's items of income, gain, loss, deduction, or credit were to be allocated among the Class C partners, presumably in proportion to each partner's ownership of partnership stock.

| | | 1978 | | | 1979– |
| --- | --- | --- | --- | --- | --- |
| | First Period | Second Period | Third Period | Fourth Period | 1983 |
| **General Partners** | | | | | |
| William Champ Emerson | —0— | —0— | —0— | 76.19% | |
| Terence McCoy | —0— | —0— | —0— | 23.81% | |
| Total | —0— | 100.00% | 100.00% | 100.00% | 69.00% |
| Grand Total | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

Article 8.01 of the partnership agreement provided that for years after 1983, partnership items were to be allocated "to the Partners in Commendam and their assignees, and the General Partner in proportion to their ownership of Partnership Stock, unless otherwise agreed among the Partners." The partners' capital accounts were to be adjusted to reflect any allocation to them of items of income, gain, loss, or deduction. However, in the event of a liquidation or termination of the partnership, partners having deficit balances in their capital accounts would not be required to make up the deficits in these accounts to the partnership or its creditors, nor would such partners be required to receive a proportionately smaller share of partnership assets. Upon the sale of partnership property at a profit, income, to the extent "recaptured" under sections 1245 or 1250, would be allocated (or "charged back") to those partners to whom the depreciation deductions had been allocated previously, but, as will be explained below, the cash proceeds of the sale would be distributed without regard to tax allocations or capital account balances. The partners' capital accounts were of importance only for accounting and tax purposes.

Under Article 8.06 of the partnership agreement, positive cash flow was to be accumulated in 1978, and then distributed in years 1979 through 1983 according to a schedule which gave a "priority distribution right" to a specified amount of such cash flow to the Class B and C partners in commendam; the cash would be distributed among the Class B and C partners in proportion to their ownership of partnership stock. For years 1984 and after, Class B and C partners in commendam were to have a "priority distribution right" to any positive cash flow in the amount of $.08 for every $1.00 of their "net capital contributions" (cash contributions less (1) priority cash flow received, (2) proceeds from refinancing, and (3) proceeds from sale of partnership property); any additional positive cash flow might, in the discretion of the general partners, be distributed to all partners in the same proportions as their ownership of partnership stock. In 1980, Riverside distributed positive cash flow arising from its operations in 1979 and 1980 to the Class B and C partners in commendam in accordance with their "priority distribution rights" under the partnership agreement. In 1980, 1982, and 1983, Riverside distributed cash proceeds made available by the refinancing of partnership debts to all partners on the basis of their ownership interests in partnership stock.[7]

Under Article 8.04 of the partnership agreement, the proceeds of a sale of all or part of the partnership's property were to be distributed in the following order of priority: (1) To creditors; (2) to the general partner in repayment of loans to the partnership; (3) to the Class B and C partners in commendam in payment of any unsatisfied cumulative "priority distribution rights" to positive cash flow; (4) to the Class B and C partners in the amount of their "net capital contributions"; and (5) to

7. The parties have stipulated that the distributions of refinancing proceeds were "based upon the capital interests of the partners" and were "based upon the ownership of partnership stock." This appears to be true for 1980, but in 1982 and 1983, the general partners and the Class A partners in commendam received no such distributions according to a stipulated exhibit. We have relied on the parties' stipulation as the fact is not crucial to the case.

all partners in the same percentages as their ownership of partnership stock.

Riverside allocated its reported 1978 net loss (as prorated over the four periods described above) to its partners in accordance with Article 8.02 of the partnership agreement. The petitioner's distributive share of the loss consisted of 22.8 percent, or $48,732.52, of the third period's pro rata allocation of the partnership loss; she reported no distributive share of the partnership's loss allocated to the first, second, or fourth periods. On her Federal income tax return for 1978, the petitioner claimed a loss of $48,733.00 arising from her membership in Riverside.

In the notice of deficiency, the Commissioner reduced the petitioner's distributive share of Riverside's net loss to $7,276.44. He determined that the special allocation to the petitioner of 22.8 percent of the third period's pro rata share of the partnership loss lacked economic substance, and that, consequently, her proper distributive share should be based on her percentage interest in partnership stock during the third period and the fourth period.[8]

Partners must report their distributive shares of partnership income, gain, loss, deduction, or credit. Sec. 702(a). Section 704(a) provides that a "partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement." Thus, partners have "great latitude in determining themselves by their partnership agreement what their distributive shares will be." *Goldfine v. Commissioner*, 80 T.C. 843, 849–50 (1983). However, the partners' ability to make special allocations of partnership items is not unlimited: section 704(b)(2) states that if "the allocation to a partner under the agreement of income, gain, loss, deduction, or credit (or item thereof) does not have substantial economic effect," it will be disregarded, and the partner's distributive share "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)." In addition, section 706(c)(2)(B), as in effect during the year in issue, provides that where a partner's interest in the partnership varies during the year, such partner's distributive share "shall be determined by taking into account his varying interests in the partnership during the taxable year." The Commissioner has conceded that Riverside's method of accounting for its partners' varying interests in 1978—the allocation of its year-end net loss ratably over the year—is acceptable under section 706(c)(2)(B) and does not result in a prohibited retroactive allocation of partnership losses to the petitioner. See, e.g., *Johnsen v. Commissioner*, 84 T.C. 344 (1985), supplemental opinion to 83 T.C. 103 (1984). Therefore, the primary issue for decision is whether the partnership agreement's special allocation to the petitioner of 22.8 percent of the net loss allocated to the third period lacks "substantial economic effect" within the meaning of section 704(b)(2).

We observe, at the outset, that commentators have suggested that a plan of special allocations, such as that adopted in Riverside's partnership agreement, may be an effective way of achieving the same result as a retroactive allocation of losses to new-

---

**8.** The petitioner's distributive share of the partnership's 1978 net loss was redetermined by the Commissioner as follows:

THIRD PERIOD DISTRIBUTIVE SHARE
(1) Petitioner's percentage of outstanding Class C partnership stock: 4.46927%
(computed by dividing petitioner's 2.00% interest by the total 44.75% interest owned by Class C partners)
(2) Petitioner's interest in partnership stock during third period: 2.23463%
(computed by multiplying 4.46927% by 50.00%, the total ownership interest of Class C partners)

(3) Petitioner's distributive share of loss for third period: $4,734.20
(computed by multiplying 2.23463% by $211,852.27, the third period's pro rata share of the year's net loss)
FOURTH PERIOD DISTRIBUTIVE SHARE
(1) Petitioner's interest in partnership stock during fourth period: 2.00%
(2) Petitioner's distributive share of loss for fourth period: $2,542.24
(computed by multiplying 2.00% by $127,112.00, the fourth period's pro rata share of the year's net loss)

ly admitted partners, but without violating the prohibition of section 706(c)(2)(B):

Another possible method of mitigating the prohibition in § 706(c)(2)(B) against retroactive allocations would be to use a special allocation either of deductions or of bottom line losses.

For example, assume that AB partnership, using either the cash or accrual method of accounting, realizes income of $30,000 per month and pays expenses of $50,000 per month during 1981. Its loss for the year is $240,000. C becomes a one-third partner on December 1, 1981, by contributing cash to the partnership. The partners want to give C the benefit of one-third of the loss for the entire year, a deduction of $80,000. Under § 706(c)(2)(B), it is not permissible to allocate to C any portion of the loss prior to December 1, 1981, and an interim closing of the books will not help. Using a proration based upon the time C was in the partnership, C's share of the loss would be ⅓ of 1/12 of $240,000, or $6,667.

If the entire loss for December were specially allocated to C, C's share of the loss would increase from $6,667 to $20,000. Although this is still not the $80,000 C wanted, it is a substantial improvement. The remaining $60,000 of deduction might be given to C by a special allocation to C of the first $60,000 of partnership losses for 1982.

*These special allocations should be permitted provided they meet the substantial economic effect test of § 704(b)(2).* Although the effect of this allocation is to undercut the retroactive allocation prohibition, there is no reason why it should not be given the same effect as any other special allocation in the absence of sham. [2 A. Willis, J. Pennell, P. Postlewaite, Partnership Taxation, sec. 87.05, p. 87–14 to 87–15 (3d ed. 1981); fn. ref. omitted; emphasis added.]

See also M. Cowan, "Retroactive partnership allocations: New restrictions do not bar the technique," 46 J.Tax. 332, 335 (1977). As the petitioner herself points out, the allocation to her of 22.8 percent of the third period's pro rata share of the year's loss was equal to 1.87 percent of the total year's loss, or only slightly less than a retroactive allocation of the total year's loss based on her 2-percent capital interest. The Commissioner does not dispute that a special allocation may be used to achieve the same result as a retroactive allocation of the loss, but he points out that any such special allocation must have "substantial economic effect" and argues that the allocation in this case did not have substantial economic effect.

Before 1976, section 704(b)(2) provided that a special allocation under a partnership agreement would not be recognized if its principal purpose was to avoid or evade any income tax. Section 1.704–1(b)(2), Income Tax Regs., was promulgated under the prior law and provided several tests to determine tax evasion or avoidance.[9] The regulation's "substantial economic effect" test became the preeminent test of tax evasion or avoidance (*Harris v. Commissioner*, 61 T.C. 770 (1974); *Orrisch v. Commissioner*, 55 T.C. 395 (1970), affd. per curiam in an unreported opinion (9th Cir., March 3, 1973, 31 AFTR 2d 73–1069)), and in the Tax Reform Act of 1976, Pub.L. 94–455, 90 Stat. 1520, 1548, the "substan-

---

**9.** Sec. 1.704–1(b)(2), Income Tax Regs., provides in pertinent part:

In determining whether the principal purpose of any provision in the partnership agreement for a special allocation is the avoidance or evasion of Federal income tax, the provision must be considered in relation to all the surrounding facts and circumstances. Among the relevant circumstances are the following: Whether the partnership or a partner individually has a business purpose for the allocation; whether the allocation has "substantial economic effect", that is, whether the alloca-

tion may actually effect the dollar amount of the partners' shares of the total partnership income or loss independently of tax consequences; whether related items of income, gain, loss, deduction, or credit from the same source are subject to the same allocation; whether the allocation was made without recognition of normal business factors and only after the amount of the specially allocated item could reasonably be estimated; the duration of the allocation; and the overall tax consequences of the allocation. * * *

tial economic effect" test was elevated from the regulation to the statute. The remaining tests in the regulation are now of little, if any, importance (*Goldfine v. Commissioner*, 80 T.C. at 851 [10]), being characterized as "Other factors that could possibly relate to the determination of the validity of an allocation." S.Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 49, 138.[11] However, the 1976 revision of section 704(b)(2) was less substantive than it may appear; even under the prior law it was stated that "An allocation that lacks 'substantial economic effect' will not be saved by meeting the other five factors in the regulation." *Hamilton v. United States*, 231 Ct.Cl. 517, 527, 687 F.2d 408, 414 (1982); see also *Allison v. United States*, 701 F.2d 933, 937 (Fed.Cir.1983); *Boynton v. Commissioner*, 649 F.2d 1168, 1173 (5th Cir.1981), affg. 72 T.C. 1147 (1979); 1 W. McKee, W. Nelson & R. Whitmire, Federal Taxation of Partnerships and Partners, par. 10.02, p. 10–10 to 10–11 (1977).

The petitioner bears the burden of proving that the allocation to her under the partnership agreement has " 'substantial economic effect', i.e., whether the allocation may actually affect the dollar amount of * * * [her share] of the total partnership income or loss independently of tax consequences." S.Rept. 94–938, *supra*, 1976–3 C.B. (Vol. 3) at 138; sec. 1.704–1(b)(2), Income Tax Regs.; Rule 142(a), Tax Court Rules of Practice and Procedure. The test for substantial economic effect has been called a "capital account analysis" (1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.02[2], p. 10–17); in order to have a substantial economic effect, a partner's allocation must be reflected in her capital account, and, in the event of a partnership liquidation, the liquidation proceeds must be distributed in accordance with the capital account balances. *Allison v. United States, supra* at 939; *Goldfine v. Commissioner, supra* at 852–53.[12] Moreover, where a partner's capital account reflects a deficit, she must have the obligation upon liquidation to restore the deficit. Absent such an obligation, the other partner or partners would have to bear part of the economic cost of the special allocations that resulted in the deficit capital account. *Harris v. Commissioner*, 61 T.C. at 786; *Orrisch v. Commissioner*, 55 T.C. at 403–04.

■ In the present case, it is clear that the allocation to the petitioner of 22.8 percent of the third period's ratable share of Riverside's net loss lacked substantial economic effect. While the partnership agreement provided that the partners' capital accounts were to be adjusted for allocations of income, gain, loss, or deduction, the agreement specified that in the event of a liquidation or termination of the partnership, partners having deficit balances in their capital accounts would not be required to make up the deficits to the partnership or its creditors. Furthermore, the parties have stipulated (and the partnership agreement supports their stipulation) that partners having deficit balances would not receive a proportionately smaller share of partnership assets upon liquidation. Upon the sale of partnership property, the proceeds were to be distributed among the partners in the same percentages as their ownership of partnership stock, after the repayment of creditors and the payment of

---

10. *Miller v. Commissioner*, T.C. Memo. 1984–336.

11. The Commissioner has filed proposed amendments to the regulations under sec. 704(b) as amended by the Tax Reform Act of 1976. Sec. 1.704–1(b), Proposed Income Tax Regs., 48 Fed. Reg. 9871 (March 9, 1983). The proposed regulations were to be generally effective for partnership taxable years beginning after Dec. 31, 1983. However, the provisions of such regulations pertaining to the proper test for substantial economic effect were to be appli-

cable for taxable years beginning after Dec. 31, 1975. The proposed regulations adopt the capital accounts analysis as the test of "economic effect," and consider other factors (those contained in the current regulations) only as a test of the "substantiality" of the economic effect. Sec. 1.704–1(b)(2), Proposed Income Tax Regs., *supra*.

12. See also *Miller v. Commissioner*, T.C. Memo. 1984–336; *Hirsch v. Commissioner*, T.C. Memo. 1984–52; *Magaziner v. Commissioner*, T.C. Memo. 1978–205.

any arrearages in the Class B and Class C partners' "priority distribution rights." In addition, the petitioner, as a Class C partner in commendam, had a "priority distribution right" to the partnership's cash flow, and after the payment of priority distribution rights, cash flow was to be distributed on the basis of the partners' capital interests rather than on the basis of their capital accounts. Riverside's positive cash flow for 1979 and 1980 was, in fact distributed in this manner. Riverside's proceeds from the refinancing of partnership debt were also distributed in accordance with the partners' capital interests. Thus, it is not only abundantly clear that under a capital accounts analysis the petitioner did not bear the economic burden of the special allocation to her, but it is also clear that the partners' capital accounts served no purpose beyond that of tax accounting.

The petitioner contends that the allocation to her had substantial economic effect even though it did not meet the requirements of a capital accounts analysis. She maintains that the capital accounts analysis overlooks two situations where special allocations can have substantial economic effect: first, where the profit and loss allocations are proportionate to the partners' capital interests; and second, where the partnership agreement contains gain "charge back" provisions whereby partners with deficit balances in their capital accounts are allocated profits of the sale of property to bring their capital accounts to a positive balance. With respect to the first contention, the petitioner points out that she received a distributive share in 1978 of 1.87 percent of Riverside's total loss for the year, which, she contends, is slightly less than the 2.00 percent distributive share she would have received if the allocation had been based on her capital interest; therefore, she concludes that because the allocation was proportionate to her capital interest, she bore the economic burden of the allocation. We find the petitioner's first argument to be wholly without merit. In essence, she is maintaining that there was *no* special, or disproportionate, allocation to

her in 1978, but this argument ignores the fact that petitioner did not have a 2-percent capital interest in Riverside throughout the entire year; the petitioner did not join the partnership until November. It is for that reason that the partnership prorated its net loss over the year to account for the varying capital interests of its partners. Clearly, the allocation to the petitioner of 22.8 percent of the third period's loss was disproportionate to the capital interest which she held at that time, and we have determined through analysis of the partnership agreement that she would not suffer any economic burden as a result of that disproportionate allocation.

The petitioner's second contention is equally without merit. As we observed in *Orrisch v. Commissioner,* 55 T.C. at 403, the effect of a "charge back" where the property is sold at a gain affects "only the tax liabilities of the partners and will have no other economic effect." We explained:

The agreement in this case provided not only for the allocation of depreciation to petitioners but also for gain on the sale of the partnership property to be "charged back" to them. The charge back would cause the gain, for tax purposes, to be allocated on the books entirely to petitioners to the extent of the special allocation of depreciation, and their capital account would be correspondingly increased. The remainder of the gain, if any, would be shared equally by the partners. If the gain on the sale were to equal or exceed the depreciation specially allocated to petitioners, the increase in their capital account caused by the charge back would exactly equal the depreciation deductions previously allowed to them and the proceeds of the sale of the property would be divided equally. In such circumstances, the only effect of the allocation would be a trade of tax consequences, i.e., the Crisafis would relinquish a current depreciation deduction in exchange for exoneration from all or part of the capital gains tax when the property is sold, and petitioners would enjoy a larger current depreciation

deduction but would assume a larger ultimate capital gains tax liability. * * * [55 T.C. at 403.]

We therefore concluded that "To find any economic effect of the special allocation agreement aside from its tax consequences, we must * * * look to see who is to bear the economic burden of the depreciation if the buildings should be sold for a sum less than their original cost." 55 T.C. at 403. Because there was no evidence that the petitioners in *Orrisch* would be required to contribute to the partnership a sum equal to the deficit in their capital account or would be entitled to receive a proportionately smaller share of partnership assets on liquidation, we held that the special allocation of depreciation lacked substantial economic effect. See also 1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.-02[2][a], p. 10–20 to 10–21 and n. 49. The depreciation "charge back" provision of Riverside's partnership agreement is similarly to be disregarded in assessing the economic substance of the special allocation to the petitioner; the significant facts in the present case, that partners having deficit balances in their capital accounts would not have to make them up and would not receive a proportionately smaller share of partnership assets on liquidation, are indistinguishable from those in *Orrisch*. Therefore, we conclude that the petitioner has failed to prove that the special allocation to her had a substantial economic effect.

The petitioner argues, in the alternative, that if the allocation to her was invalid for lack of substantial economic effect, the invalidity is limited to the amount by which the allocation exceeded her capital account balance of $35,600 in 1978. She submits that she "has borne the economic loss of $35,600.00, and, therefore, has a valid allocation to the extent of her capital contribution," and relies on an example in 1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.02[2][c], p. 10–24 to 10–25. The authors of that treatise suggest that an allocation may have substantial economic effect in one year but lack it in the next. They observe that the regulations issued under prior law:

apparently do not contemplate the possibility that an allocation provision may be valid in some years, but not in others. * * * This "all-or-nothing" approach of the Regulation found support under the language of the original § 704(b), which focused on the "principal purpose" of an allocation to determine its validity; the forbidden purpose could presumably exist even in years during which the allocation has substantial economic effect. [1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.02[2][c], p. 10–24.]

Because section 704(b) now provides that the partnership agreement, which may be amended during the year to alter distributive shares (section 761(c)), determines distributive shares unless the agreement lacks substantial economic effect, the treatise authors maintain that "Under present law, it seems that the validity of an allocation should be determined on an annual basis." They give the following as an example of an allocation which is valid in one year, yet lacks economic substance in the next year:

*Example:* In the CD partnership described in ¶ 10.02[2][b] above, special allocation of depreciation to D in year 1 eliminated his capital account. In year 2, a continuation of the special allocation produced a deficit in D's capital account. Even if D is not obligated to restore this deficit, thus invalidating the year 2 allocation, the year 1 allocation should be valid. [1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.02[2][c], p. 10–24 to 10–25.]

Even if the special allocation to the petitioner was limited to the amount of her capital account in 1978 so that no deficit was created [13] the allocation still would lack substantial economic effect because, in the event of a liquidation, the proceeds would not be distributed on the basis of the partners' capital accounts. *Allison v. United States*, 701 F.2d at 939; *Goldfine v. Com-*

---

**13.** See *Dibble v. Commissioner*, T.C.Memo. 1984–589; sec. 1.704–1(b)(2)(ii), Proposed Income Tax Regs., 48 Fed. Reg. 9871 (March 9, 1983).

*missioner,* 80 T.C. at 852–53; 1 W. McKee, W. Nelson & R. Whitmire, *supra* at par. 10.02[2], p. 10–17, and at par. 10.-06[1][a], p. 10–47. While the petitioner would receive a disproportionate share of the partnership's tax loss, she would not suffer any corresponding reduction in the dollars that she would receive upon liquidation.

■ Because the special allocation to the petitioner lacked substantial economic effect, we must redetermine her distributive share of Riverside's 1978 net loss "in accordance with * * * [her] *interest in the partnership (determined by taking into account all facts and circumstances)."* Sec. 704(b); emphasis added. "Among the relevant factors to be taken into account are the interests of the respective partners in profits and losses (if different from that of taxable income or loss), cash flow; and their rights to distributions of capital upon liquidation." S. Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 138. The parties are essentially agreed that the petitioner's "interest in the partnership" is her 2-percent capital interest. However, the Commissioner would redetermine the petitioner's distributive share of the partnership's net loss by taking into account the fact that her capital interest varied over the course of the year; whereas, the petitioner claims that section 704(b) entitles her to a distributive share of 2 percent of the partnership's net loss without adjustment for her varying interest. We accept the Commissioner's computation as correct, and we hold that a partner's varying capital interest must be accounted for when redetermining the partner's distributive share in accordance with her "interest in the partnership" under section 704(b)(2). There is nothing in either the statutory language or legislative history of section 704(b)(2) to indicate that it was intended to override the requirements of section 706(c)(2)(B). The Commis-

sioner's redetermination has properly implemented the purposes of both sections.[14]

*Decision will be entered for the respondent.*

### DECISION

Pursuant to the determination of this Court as set forth in its Opinion filed May 16, 1985, it is

ORDERED and DECIDED: That there is a deficiency in income tax due from the petitioner for the taxable year 1978 in the amount of $26,814.54.

/s/ Charles R. Simpson
Judge

Entered: May 16, 1985

---

**14.** In n. 8, *supra,* we have set forth the method used by the Commissioner to compute the loss allowable to the petitioner. Since not all of the units for Class C partners were actually sold during the third period, the Commissioner determined that the petitioner's interest in the loss for that period actually exceeded 2.00 percent, and the petitioner has not challenged that computation.