ROBERT E. BARRON, SR., AND ALICE M. BARRON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PAUL SANDERS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barron v. Commissioner
Docket Nos. 26850-90, 26914-90
United States Tax Court
T.C. Memo 1992-598; 1992 Tax Ct. Memo LEXIS 618; 64 T.C.M. (CCH) 1034; October 6, 1992, Filed *618 Decisions will be entered under Rule 155. For Petitioners: Louis R. Petrilli. For Respondent: Gregory Arnold. NAMEROFF
NAMEROFF
MEMORANDUM FINDINGS OF FACT AND OPINION NAMEROFF, Special Trial Judge: These cases, consolidated for purpose of trial, briefing, and opinion, were heard pursuant to the provisions of section 7443A(b)(3) [1] and Rules 180-182. In docket No. 26850-90, respondent determined deficiencies in income tax for the taxable years 1981 and 1983 in the amounts of $ 4,003 and $ 6,347, respectively. Respondent also determined additions to tax for 1981 and 1983 under section 6653(a)(1) in the respective amounts of $ 200.15 and $ 317.35 and under section 6653(a)(2) in the amount of 50 percent of the interest payable on the entire underpayment for each year. Further, for 1983, respondent determined an addition to tax under section 6661(a) *619 in the amount of $ 1,586.75. In docket No. 26914-90, respondent determined a deficiency for the taxable year 1983 in the amount of $ 2,650, plus additions to tax under section 6653(a)(1) in the amount of $ 132.50 and under section 6653(a)(2) in the amount of 50 percent of the interest payable on the entire underpayment. After various concessions by the parties, which will be effected in a Rule 155 computation, the issues for decision are as follows: (1) Whether B & B Forest Products (hereafter B & B) was operated as a partnership and, if so, what were the terms of the partnership agreement regarding the partners' distributive shares; (2) what was B & B's basis in various assets and the appropriate methods of depreciation and recovery periods for such assets. Resolution of these issues will enable us to determine the proper depreciation allowance for 1981 and 1982; [2] the allowable investment tax credit (ITC), if any, for 1981; the amount of gain, if any, for 1981 resulting from the disposition of one of B & B's trucks; and, if B & B was a partnership, Robert E. Barron's (Barron) and Paul Sanders' (Sanders) respective bases in their partnership interests when the partnership was *620 incorporated in 1982; (3) the amount and character of gain or loss incurred by Barron and Sanders on the sales of B & B, Inc. stock (subsequent to B & B's incorporation) in 1983; (4) whether Barron and Sanders each received a taxable distribution of $ 2,500 from B & B, Inc., during 1983; (5) whether the Barrons are entitled to a short-term capital loss of $ 9,403 and a long-term capital loss of $ 5,000 claimed on their 1981 tax return; and finally, (6) whether petitioners in each docket are liable for the additions to tax set forth in the respective notices of deficiency. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein *621 by this reference. At the time of the filing of the respective petitions, petitioners all resided in California. Barron was a 50-percent stockholder in B & M Trucking (B & M). During 1980, Barron received a 1972 and a 1973 Kenworth truck from B & M shortly before it ceased its business operations. The Barrons, on their 1981 tax return, claimed a short-term capital loss of $ 9,403 allegedly arising out of a bad debt due from B & M, and a long-term capital loss of $ 5,000 with respect to their stock investment in B & M. In late 1980, Barron entered into an oral agreement with Sanders, Earl M. Herrman (Herrman) and B.C. LeClerc (LeClerc) to conduct business activities, such as the bagging and shipping of various wood products and potting soil, under the name of B & B. Barron contributed to B & B the two trucks he received from B & M. [3] Sanders contributed three newly purchased Hobbs trailers, financed by a $ 14,600 loan (dated October 14, 1980) from the Imperial Bank, in return for B & B's assumption of the loan. [4] The loan was paid in full by B & B (or its corporate successor) on October 15, 1982. *622 On October 16, 1980, Barron applied to the City of Torrance for a business license under the name of B & B, indicating B & B would be owned and operated as his sole proprietorship. Additionally, Barron acquired a workers' compensation liability policy in his own name d.b.a. B & B Forest Products. However, on October 17, 1980, $ 2,000 (petitioners, Herrman, and LeClerc each contributing $ 500) was deposited into a bank account in the name of B & B, and each of the four men signed the signature card allowing them each access to the account. To conduct its activities, B & B needed substantial additional equipment. Thus, from time to time, Barron, usually accompanied by LeClerc, traveled to several auctions in northern California to purchase such equipment. The equipment was purchased with cash obtained prior to each trip from Barron, Herrman, Sanders and LeClerc. At trial, Barron was unable to present any receipts, bills of sale, or certificates of title to substantiate these purchases. The only evidence offered, other than testimony, was a letter from Barron, dated November 19, 1984, to his accountant describing the assets as "scrap and used equipment" and itemizing such as *623 a soil bagger, a forklift, rollers, and miscellaneous equipment. Moreover, in a "Declaration of Facts" addressed to respondent on March 26, 1986, Barron further described these items as a bobcat, a front-end load tractor, three hoppers, a compressor, and forklifts. Each communication reflected values assigned to these assets based upon Barron's memory and estimation of their value and cost. B & B did not file a partnership return for the 1981 tax year. Barron explained that his accountant had advised him it was unnecessary to file an information return for the 1981 tax year because B & B had a very small loss, and such loss could be accounted for in the subsequent year. Neither Barron nor any of the alleged partners claimed their distributive share of B & B's alleged loss on their 1981 individual tax returns. However, in 1982, Barron reported a loss of $ 11,434 from B & B on his Schedule C, which allegedly represented the entire loss incurred by B & B for that year. On or about July 1, 1982, B & B was incorporated as B & B, Inc., and each partner received an equal share of the corporation. In 1983, prior to the sale of their B & B stock, Barron, Sanders, Herrman and LeClerc *624 each received a $ 2,500 distribution from the corporation. On the corporation's check register, the $ 2,500 distributions were charged to account 404, "Subcon." [5] Thereafter, on March 1, 1983, Barron, Sanders, and Herrman sold their respective shares of B & B, Inc. stock to LeClerc, and each received $ 21,000 for such shares. Neither Barron nor Sanders reported either gain or loss from these transactions on his 1983 return. OPINION Issue 1. Whether B & B Constituted a Partnership
The first issue for resolution is whether B & B constituted a partnership. Respondent, in the notice of deficiency, determined that B & B was Barron's sole proprietorship. Respondent also determined that Barron had (1) income of $ 25,486 from the operation of B & B in 1981; (2) a gain of $ 16,709 from the disposition of the 1972 truck in 1981; and (3) a loss of $ 2,783 [6] attributable to the operation of B & B in 1982. Barron contends that B & B was a partnership *625 in which he was one of four equal partners, and therefore, is only responsible for reporting one-fourth of the income, if any, of B & B. Additionally, Barron also contends that he was allocated 100 percent of B & B's losses so as to compensate him for his management of the partnership. For Federal income tax purposes, the term "partnership" includes: Sec. 761(a). Partnership. -- * * * a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a corporation or a trust or estate. * * * The test of whether a partnership exists is primarily one of intent, the key inquiry being whether "the parties in good faith and acting with a business *626 purpose intended to join together in the present conduct of an enterprise." Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). In determining whether persons have formed a partnership which is to be afforded recognition for tax purposes, the Court looks at the following factors, none of which is conclusive:
The agreement of the parties and their conduct in executing its terms; the contributions, if any, which each party has made to the venture; the parties' control over income and capital and the right of each to make withdrawals; whether each party was a principal and coproprietor, sharing a mutual proprietary interest in the net profits and having an obligation to share losses, or whether one party was the agent or employee of the other, receiving for his services contingent compensation in the form of a percentage of income; whether business was conducted in the joint names of the parties; whether the parties filed Federal partnership returns or otherwise represented to respondent or to persons with whom they dealt that they were joint venturers; whether separate books of account were maintained for the venture; and whether the parties exercised *627 mutual control over and assumed mutual responsibilities for the enterprise. [Luna v. Commissioner, 42 T.C. 1067, 1077-1078 (1964).] Moreover, a partnership agreement may be oral, as in the instant case. Stern v. Commissioner, T.C. Memo. 1984-383; Sec. 1.761-1(c), Income Tax Regs.; see also Weiner v. Fleischman, 816 P.2d 892, 895 (Cal. 1991). However, in the case of an oral partnership agreement, all of the facts and circumstances surrounding the formation and operation of the partnership are relevant in determining the sharing ratios of the partners. Hogan v. Commissioner, T.C. Memo. 1990-295; Reed v. Commissioner, T.C. Memo. 1978-58; Ryza v. Commissioner, T.C. Memo. 1977-64. We are persuaded from the record that petitioners, along with Hermann and LeClerc, intended to conduct an enterprise jointly for profit. The initial creation of a bank account with all four signatures, the contribution by Barron and Sanders of the trucks and trailers to the venture, and the cash contributions of the men *628 for the purchase of additional assets indicate B & B was created and operated as a partnership. Although there are various documents to the contrary, such documents were explained by Barron as prepared either based upon the exigency of the moment or by others without his consultation and, we think, are not controlling. Accordingly, we hold that B & B was a partnership for Federal income tax purposes. Thus, having concluded a partnership did exist, we must determine the terms of the partnership agreement regarding the partners' distributive shares. A partner must take into account his distributive share of each item of partnership income, gain, deduction, loss, and credit in determining his income tax. Sec. 702(a). Section 704(a) generally provides that a partner's distributive share shall be determined by the partnership agreement. However, if the partnership agreement does not provide as to the partner's distributive share of such items or the allocation to a partner under the agreement of such item does not have substantial economic effect, then the partner's distributive share of the partnership's income, gain, loss, deduction, or credit is determined in accordance with *629 the partner's interest in the partnership. Sec. 704(b). Upon formation of B & B, the oral partnership agreement did not provide for the partners' distributive shares of income, gain, loss, deduction, and credit. Accordingly, such items would be allocated in accordance with the partners' interests, which are presumed to be equal. Sec. 1.704-1(b)(3)(i), Income Tax Regs. Although such presumption may be rebutted, no probative evidence to the contrary has been presented. Accordingly, all four men were equal partners and, as such, are to be allocated 25 percent of such items. Prior to the incorporation of the partnership in July 1982, the partners purportedly modified the oral agreement so as to allocate 100 percent of the partnership's losses to Barron to compensate him for his services as managing partner. Barron and Sanders testified as follows: Question: Now, why did you take this entire $ 11,000 loss for yourself rather than giving your other partners their share of this loss? Barron: When we got to the point of incorporating and we closed out the partnership, they said for me to go ahead and take the loss because I had done all the work. I had done everything myself *630 and, therefore, if there was anything to be had from that, for me to take the loss and we'd start over fresh as an individual; we'd start over fresh as a corporation. * * * Question: Well, with respect to any profits or losses that would be derived from the partnership, what did you tell Mr. Barron with respect to any profit or loss that you be entitled to? Sanders: We, I believe both myself and the other party, told Mr. Barron that if there was any losses in that company, he could have them. I was not in a position to want them or need them at that particular time. An allocation must have substantial economic effect to be sustained, or else the allocation of profits and losses will follow the individual partners' interests in the partnership. Sec. 704(b). To determine whether an allocation has substantial economic effect, it is necessary to determine whether the partner to whom the item is allocated for tax purposes also bears the economic burdens and benefits of that allocated item. Elrod v. Commissioner, 87 T.C. 1046, 1084 (1986); Goldfine v. Commissioner, 80 T.C. 843, 851 (1983); Orrisch v. Commissioner, 55 T.C. 395, 403-404 (1970), *631 affd. per curiam by unpublished opinion (9th Cir., Mar. 3, 1973). It appears from this record that no capital accounts were maintained for the individual partners. We cannot therefore observe whether the capital accounts reflected the alleged allocations. It seems, however, that the incorporation of the partnership was effected by issuing an equal number of shares of stock in the new corporation to each of the partners. Thus, the partnership did not acknowledge the alleged allocation of the 1982 loss to Barron. Therefore, the alleged allocation was for tax purposes only and did not have substantial economic effect. See Gershkowitz v. Commissioner, 88 T.C. 984, 1019 (1987); Elrod v. Commissioner, supra at 1084; Ogden v. Commissioner, 84 T.C. 871, 884-885 (1985), affd. per curiam 788 F.2d 252 (5th Cir. 1986); Goldfine v. Commissioner, supra at 852; Orrisch v. Commissioner, supra at 403-404. Since the alleged allocation did not have substantial economic effect, the partners' distributive *632 shares will be in accordance with each partner's interest. Accordingly, 25 percent of the partnership's losses is allocated to each of Barron and Sanders. [7]
Issue 2. Depreciation Allowance and Related Issues
Depreciation
We now consider the depreciation allowance and other related items claimed by B & B for the 1981 [8] tax year. The parties stipulated that for the 1981 tax year B & B had net income before depreciation of $ 31,225. The following schedule lists the assets for which depreciation is in dispute, and both respondent's and Barron's contentions as to the partnership's proper basis in such assets: Asset
Respondent
Barron
1973 Truck
$ 9,690
$ 25,000
Hobbs Trailers
8,767
14,600
Bailer
24,680
31,800
Misc. Equipment - 0 -
36,900
*633 Barron also claims such assets have a 3-year recovery period and are depreciable pursuant to the straight line method. Respondent determined that the straight line method is only available for the truck (and a later acquired "KW engine"), and that the accelerated cost recovery system (ACRS) is required for the trailers, bailer, and if applicable, the miscellaneous equipment. Additionally, respondent determined all the assets have a 5-year recovery period. 1. Basis
The partnership's basis in the 1973 truck is the same as the adjusted basis of the contributing partner (Barron). Sec. 723. No evidence was presented at trial establishing Barron's basis in the truck at the time of contribution. However, Barron contends that B & B is entitled to a $ 25,000 basis in the 1973 truck. Barron's calculation is somewhat convoluted, in that it is predicated on the insurance proceeds ($ 21,978) B & B received on another truck (the 1972 truck) which had been destroyed in 1980. Barron contends that the insurance proceeds reflected the fair market value of the destroyed truck, which was also his basis (because he had received the truck pursuant to B & M's liquidation), and therefore, the *634 1973 truck, on which depreciation is being claimed, should be assigned a higher estimated value of $ 25,000 because it is a 1973 truck rather than a 1972 truck. First, there is no evidence regarding the purported liquidation of B & M. Further, since no evidence was presented at trial establishing the terms of the insurance policy, the fair market value of the destroyed truck, or the condition of the 1973 truck (which albeit newer may not have been in as good condition, considering that both trucks were over 7 years old), Barron has not satisfied his burden of proving that respondent's determination was incorrect. Therefore, we sustain respondent's determination as to the partnership's basis in the 1973 truck. As to the Hobbs trailers, we find that Sanders purchased and contributed the trailers to the partnership subject to a debt of $ 14,600, [9] which the partnership assumed. Accordingly, the partnership is entitled to a carryover basis in the Hobbs trailers of $ 14,600, as claimed. Sec. 723. *635 With respect to the bailer acquired by the partnership in August 1981, respondent allowed a basis of $ 24,680. B & B borrowed $ 6,000 from the Torrance National Bank during 1981 for the purchase of the bailer. Barron signed the note, and Sanders and LeClerc signed as guarantors. Additionally, according to the notes made by the attending loan officer, the full price of the bailer was $ 31,800, on which B & B had already made a $ 7,000 deposit. When the bailer was fully assembled, the bank was to advance an additional $ 18,700. [10] Based on the entire record, we find the actual purchase price of the bailer was $ 31,700 (the bank loans plus the deposit), and thus, B & B's basis in the bailer is $ 31,700. Finally, with regard to the miscellaneous equipment, although we believe B & B may very well have had additional machinery and equipment for its operations, there was absolutely no evidence, other than Barron's recollections, to establish dates of purchase or *636 cost. Moreover, it should have been relatively simple to have proven coordinated withdrawals from the various partners' bank accounts to corroborate the testimony offered. Accordingly, on this record, there is no basis upon which we could estimate the cost of these items. See Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Therefore, respondent is sustained. [11]
2. Method of Depreciation
Next we must determine whether depreciation of the trailers and bailer should be computed in accordance with ACRS or section 167. [12] Section 168 was initially added to the Code by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 201(a), 95 Stat. 203, and was effective for assets placed in service subsequent to December 31, 1980, in taxable years ending after such date. For such assets, *637 the provisions of section 168 are mandatory, [13] unless a timely election is made under section 168(b)(3). Nowhere in this record is there any indication that an appropriate election was made to depreciate the trailers and bailers pursuant to the alternate method of depreciation provided in section 168(b)(3). B & B did not file a partnership return for 1981 and, therefore, failed to meet even the most minimal requirement for making a valid election to avoid the application of ACRS. Consequently, B & B must calculate its depreciation allowance for the trailers and bailer under section 168 as determined by respondent. 3. Proper Recovery Period
With regard to the proper recovery period for the various assets, we note the record contains no evidence whatsoever *638 that 3 years is the more appropriate recovery period. Accordingly, the petitioners have failed in their burden of proof and, to the extent relevant, we sustain respondent's determination. Investment Tax Credit
With respect to the ITC, each partner's share of the ITC is based upon his share of the basis of the section 38 property. Sec. 1.46-3(f)(1), Income Tax Regs. Each partner's share of the basis of section 38 property is determined in accordance with the ratio in which the partners divide the general profits of the partnership regardless of whether the partnership has a profit or loss for its taxable year during which the section 38 property is placed in service. Secs. 1.46-3(f)(2)(i), 1.704-1(b)(4)(ii), Income Tax Regs. Thus, Barron is allocated 25 percent of the basis of the section 38 property and the corresponding ITC. [14]
Gain from Insurance Proceeds
The next issue concerns whether B & B recognized a gain of $ 16,709.24 from the *639 receipt of insurance proceeds in 1981 resulting from the destruction of the 1972 truck in 1980. [15] While the parties have treated this issue as separate and apart from the operations of B & B, it is clear that it was a transaction of the partnership (the truck having been contributed to the partnership by Barron before the accident, and the insurance proceeds having been deposited to B & B's bank account). Respondent determined that B & B received a gain of $ 16,709 which represents the insurance proceeds from the destruction of the truck less the outstanding debt on the truck (which respondent further determined was B & B's adjusted basis in the truck). Barron contends that the basis of the truck was equal to the insurance proceeds, thereby resulting in no taxable gain or loss. Barron's assumption is once again *640 predicated upon his belief the insurance proceeds reflected the fair market value of the truck, which was the partnership's basis. Based on our previous discussion, we hold that Barron has failed to show respondent erred in determining the amount of gain resulting from the partnership's receipt of insurance proceeds. Accordingly, we sustain respondent. Issue 3. Determination of Basis in B & B Stock
We must determine Barron's and Sanders' respective bases in their partnership interests (which is their bases in the corporate stock) as of the date of incorporation of B & B so as to determine their gain (or loss) on the sale of their B & B stock to LeClerc in 1983. Each partner's basis in his partnership interest consists of his adjusted basis in any property contributed to the partnership, increased by his distributive share of taxable partnership income, and decreased by his distributive share of partnership loss. Secs. 705(a), 722. However, when a partnership assumes an individual partner's liabilities, the assumption of such liability results in a deemed distribution of the amount assumed to such partner and an increase in the capital accounts of the other partners. *641 Additionally, any increase or decrease in a partner's share of partnership liabilities is deemed either a cash contribution by the partner to the partnership or a distribution to the partner by the partnership. Sec. 752(a) and (b). As the partnership pays off its liabilities, the partners will be treated as if they received a distribution and their basis in the partnership will be decreased accordingly. Thus, if a partner contributes an asset, the cost of which was entirely subject to debt assumed by and paid off by the partnership, the partner receives no basis in the partnership as a result thereof (e.g., cost (say $ 10,000) less 100 percent assumed debt (also $ 10,000) plus share of liability assumed (one-fourth or $ 2,500) less liability paid ($ 2,500) equals zero). With these principles in mind, we can compute Barron's basis in B & B as of the date of incorporation as follows: Initial cash
$        500.00
1973 truck [1] (per notice of deficiency)
9,690.00
1/4 of B & B's 1981
and 1982 profit or loss
to be recomputed
Plus 1/4 of partnership debt
as of June 30, 1982
4,677.75
Basis
$ to be computed
*642 Similarly, Sanders' basis in B & B at the date of incorporation is computed as follows: Initial cash
$     500.00
1/4 of B & B's 1981
and 1982 profit or loss
to be recomputed
Plus 1/4 of partnership debt
as of June 30, 1982 [1]
4,677.75
Basis
$ to be computed
Moreover the gain (or loss) recognized by petitioners on the sale of their B & B stock would be long-term capital gain (or loss). Under section 1223(1), petitioners' holding period is determined by including the period in which they held the partnership interest (a capital asset) which they exchanged for the B & B stock in a nontaxable exchange pursuant to section 351. Thus, as their holding period *643 exceeded 1 year and the stock is a capital asset, any capital gain or loss would be long-term. Accordingly, such determination is subject to the Rule 155 computation. Issue 4: Taxability of $ 2,500 Distribution
In 1983, Barron and Sanders each received a $ 2,500 distribution from B & B. Respondent determined such distribution represented taxable income to petitioners. The testimony of the shareholders pertaining to the distribution was contradictory. Barron testified that the $ 2,500 distribution represented a return of his share of a $ 10,000 investment by the four partners (prior to incorporation) in connection with a separate project not related to the activities of B & B. However, Sanders testified the $ 2,500 constituted reimbursement of expenses he had incurred on behalf of B & B, but offered no substantiation of any such expenses. Herrman also testified on this issue, but could not recall the purpose of the $ 2,500. Accordingly, there is insufficient credible evidence to overcome the presumption of correctness of respondent's determination that these distributions represented taxable income. Therefore, we hold for respondent. Issue 5. Barrons' Entitlement *644 to a Short Term Capital Loss and Long Term Capital Loss
On the Barrons' 1981 tax return a short-term capital loss of $ 9,403 with respect to a bad debt allegedly due from B & M, and a long-term capital loss of $ 5,000 with respect to their stock investment in B & M was claimed. However, no evidence was presented substantiating such losses and to overcome the presumption of correctness which attaches to respondent's determination as set forth in the notice of deficiency. In fact, this issue was utterly ignored by Barron. Accordingly, we sustain respondent. Issue 6. Additions to Tax
The final issues relate to the additions to tax for negligence and substantial understatement of tax. As to negligence, we think it is clear that Barron was negligent in not reporting any income in 1981 with respect to B & B, and both Barron and Sanders were negligent in 1983 with respect to failing to report the $ 2,500 distribution from B & B and gain (or loss) on the disposition of the B & B stock. Barron's defense of reliance on his accountant is discounted by his failure, as chief executive operator, to either maintain adequate books and records or file an information return for B & *645 B for the 1981 tax year. Neither Barron nor Sanders demonstrated that he had a reasonable basis for his reporting positions in respect of any of the sustained adjustments. We therefore sustain respondent's determination as to the additions to tax for negligence. Finally, we consider Barron's contention that he is not liable for an addition to tax for 1983 pursuant to section 6661(a). Sec. 6661(a) provides for an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. Cloud v. Commissioner, 97 T.C. 613 (1991); Pallottini v. Commissioner, 90 T.C. 498 (1988). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Cloud v. Commissioner, supra; Woods v. Commissioner, 91 T.C. 88, 94 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. Sec. 6661(b)(1)(A). For purposes *646 of this addition to tax, the understatement is reduced to the extent it is based on substantial authority or is adequately disclosed on the return or in a statement attached to the return. Sec. 6661(b)(2)(B). Section 6661(c) provides: Authority to Waive. -- The Secretary may waive all or any part of the addition to tax provided by this section on a showing by the taxpayer that there was reasonable cause for the understatement (or part thereof) and that the taxpayer acted in good faith. The appropriate standard of review is whether respondent has abused her discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). We accord appropriate deference to respondent's determination. Moreover, there is no evidence that the understatement was due to reasonable cause or that Barron acted in good faith. Accordingly, we sustain respondent's determination of the addition to tax under section 6661(a) if the Rule 155 computation demonstrates that there is a substantial understatement of income tax. To reflect the above conclusions, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Although we do not have jurisdiction over 1982, in redetermining the deficiency of income tax for 1981 and 1983 we may consider facts with relation to taxes for other years for the sole purpose of redetermining the amount of the deficiency for the years over which we have jurisdiction. Sec. 6214(b).↩
3. Sometime, apparently prior to January 1, 1981, the 1972 Kenworth truck was destroyed. In 1981, insurance proceeds of $ 21,978.24 were received, of which $ 5,269 was used to pay off the remaining debt on the truck. The remaining $ 16,709.24 was deposited to B & B's account. ↩
4. The trailers had been purchased by Sanders several days before he contributed them to the partnership. At the time of their purchase, Sanders was not engaged in a business in which they could be used. Accordingly, the trailers were never placed in service prior to his contribution to B & B.↩
5. This accounting notation was never explained by petitioners.↩
6. Respondent determined an increase to income of $ 8,651 for 1982 which represents the difference between the loss actually sustained with respect to the operation of B & B and the loss reported on Barron's 1982 tax return.↩
7. While the amount of any distributive share for Sanders is not determined in the notice of deficiency per se, it is relevant to the determination of his basis in the stock of B & B Inc.↩
8. Although the partnership was created in October of 1980, there is no indication in the record that the partnership began to carry on a trade or business in 1980. Indeed, the depreciation schedules suggested by both parties reflect that the assets were placed in service as of Jan. 1, 1981.↩
9. Sanders signed an installment note for $ 14,600 payable to the Imperial Bank on Oct. 14, 1980. Shortly after, Sanders contributed the trailers to the partnership. Thus, we assume that Sanders had not paid any portion of the amount due on the note. In addition, the trailers had not been depreciated prior to being contributed to the partnership. Moreover, petitioners do not contend that the partnership basis in the trailers was anything other than the $ 14,600. Accordingly, we assume that the amount evidenced by the installment note represents Sanders' basis in the trailers.↩
10. The apparent $ 100 discrepancy was not explained.↩
11. In the notice of deficiency, respondent allowed ITC for the trailers and bailer based upon a total cost of $ 33,447. Consistent with our determination, this credit should be recalculated.↩
12. The parties agree that the 1973 truck is depreciated in accordance with the straight line method of depreciation. ↩
13. The anti-churning rules do not apply to the trailers, because they had not been placed in service prior to Jan. 1, 1981. Sec. 168(f)(5).↩
14. Respondent made no determination regarding recapture of ITC.↩
15. It appears from the record that B & B was on the cash method of accounting. Therefore, any gain resulting from the receipt of insurance proceeds would be includable in income in the year received.↩
1. No separate entry is made for the 1972 truck, as Barron's basis for this truck was only the amount of the debt thereon which was assumed by the partnership and paid in full in 1981.↩
1. No entry for basis is separately shown for the contribution of the Hobbs trailers, as their purchase was fully leveraged, which debt was assumed by B & B. Sanders does have basis for his share of any amount thereof unpaid at June 30, 1982, which is presumably part of the total partnership liabilities of $ 18,771, one-fourth of which is $ 4,677.75.↩