JACK D. MCGUFFEY AND MARY J. MCGUFFEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; THOMAS C. BENNETT AND CHARLESEAN BENNETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
McGuffey v. Commissioner
Docket Nos. 2541-85; 2542-85.
United States Tax Court
T.C. Memo 1989-267; 1989 Tax Ct. Memo LEXIS 268; 57 T.C.M. (CCH) 584; T.C.M. (RIA) 89267; June 6, 1989. William H. Boling, Jr., and John M. Graham III, for the petitioners. Eric B. Jorgensen, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax for the following years in these consolidated cases: Additions to Tax
Section
Section
Year
Petitioner
Deficiency
6653(a)(1) [1]
6653(a)(2)
1981
McGuffey
$ 2,232.00
-
-
1981
Bennett
22,985.21
$ 1,149.26
*
1982
Bennett
19,757.32
-
-
The issues for decision [2] are: (1) Whether certain advances made by a partnership of which petitioners-husbands are members were loans or contributions to capital; (2) If the above advances were loans, whether the loans became worthless in 1981; (3) Whether for 1981, a disproportionate *271 allocation of the operating loss of the above partnership among the partners had a substantial economic effect; and (4) Whether petitioners Thomas C. and Charlesean Bennett are liable for 1981 for the additions to tax under sections 6653(a)(1) and 6653(a)(2). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulations of fact, supplement to the stipulations of fact, and attached exhibits are incorporated herein by this reference. All petitioners resided in Rome, Georgia, at the time they filed their petitions with the Court. In 1971, petitioner Thomas C. Bennett (hereinafter referred to as "Bennett") was a shareholder in the Charles Williams Real Estate Investment Corporation (hereinafter referred to as "CWREIC"), a Georgia corporation in the real estate development business. Bennett owned twenty percent of the stock of CWREIC. The balance of the stock was owned by Charles S. Williams (hereinafter referred to as "Williams") (sixty *272 percent) and John C. Busbin (hereinafter referred to as "Busbin") (twenty percent). Bennett, a certified public accountant, was employed as treasurer of CWREIC until 1972; Busbin was employed as its vice president also until 1972. In 1971, Williams, Bennett, and Busbin formed The Meadows, Ltd. (hereinafter referred to as "the Meadows"), an Alabama limited partnership, to develop and build a 200-unit apartment project (hereinafter sometimes referred to as "the Project") in Montgomery, Alabama. The partners' ownership interests in the Meadows were as follows: Williams (sixty percent), Bennett (twenty percent), and Busbin (twenty percent). Bennett maintained the books and records of the Meadows. On October 14, 1971, the Meadows contracted with Three Rivers Construction Company of Georgia, Inc. (hereinafter referred to as "Three Rivers") to construct the Project for the stipulated sum of $ 1,899,750. According to the contract, work on the Project was to commence on September 13, 1971, and be completed by May 1, 1973. Williams was the sole shareholder of Three Rivers and its president. Williams was involved primarily in the administrative functions of Three Rivers, not with the *273 actual construction operations it conducted. Bennett worked as treasurer of Three Rivers until 1972 and maintained its books and records. The Project obtained a construction loan from the First National Bank of Montgomery (hereinafter referred to as "First National Bank"). This loan was personally guaranteed by Williams, Bennett, and Busbin. The Project arranged for a permanent loan commitment of $ 2,400,000 from Aetna Life Insurance Company. Construction actually began on the Project in late October 1971. In 1971, petitioner Jack D. McGuffey (hereinafter referred to as "McGuffey") was employed as vice president of Three Rivers in charge of supervising construction activities in the field. As such he was supervisor in charge of the Project; however, Three Rivers also hired a local Montgomery contractor to serve as project superintendant of the Project. Three Rivers itself had very little equipment; most of the actual construction work was performed by subcontractors. Total construction costs for the Project were computed in 1971 at $ 2,650,000. After land acquisition costs, architect fees, legal fees, broker fees, mortgage fees, construction lender fees, interest, and *274 a development fee were paid, however, only $ 1,850,000 of the construction loan remained to allot for actual construction costs. The Meadows then began to make changes in the Project to reduce costs. The Project encountered delays and problems early, including zoning problems; bad soil conditions; and inclement weather. Sometime after construction began, Bennett and McGuffey concluded that Three Rivers would not be able to complete the Project. McGuffey was not satisfied with the ownership, management, profitability, or use of funds of Three Rivers. He wanted an ownership interest in Three Rivers which he felt Williams had promised to him. In early 1972, McGuffey resigned from Three Rivers. Sometime beginning in 1972, Bennett and Busbin began to disagree with Williams as to the ownership, management, profitability, and use of funds of CWREIC and several other projects with which they were jointly involved. Bennett and Busbin wanted a larger percentage of ownership and control. In early 1972, Bennett and Busbin resigned from CWREIC and Bennett resigned as treasurer of Three Rivers. Sometime before leaving CWREIC and/or Three Rivers, Bennett, Busbin, and McGuffey approached *275 Williams about the Project. They told Williams they were leaving and were going to form their own company. They also told Williams that they wanted to complete the Project because they felt he could not handle it. Sometime thereafter, after much negotiation, Williams agreed to let Bennett, Busbin, and McGuffey take the Project and complete it. On March 10, 1972, Bennett, Busbin, and McGuffey formed Bennett, Busbin, and McGuffey Corporation (hereinafter referred to as "BBM"), a Georgia corporation engaged in the construction business. They each purchased approximately $ 5,000 in stock. Each of them had a thirty-three and a third percent interest in BBM. Bennett maintained the books and records of BBM. He also was its president. Busbin was its chairman of the board and secretary. McGuffey's position with BBM, if any, is not stated in the record. By agreement dated May 23, 1972, Three Rivers entered into a contract with BBM pertaining to the completion of the Project (hereinafter referred to as "the contract"). The contract provided that BBM was to furnish all labor, material, and equipment, and complete the Project in accordance with the contract with the Meadows and Three *276 Rivers. BBM was authorized to use the Three Rivers' name on the Project and to carry forward any contracts entered into by Three Rivers pertaining to the Project. BBM was permitted to carry on the Three Rivers' bank account at the First National Bank of Rome, Rome, Georgia, including the right to endorse and sign checks against the account. Three Rivers was given the right to inspect the books and accounts maintained on the Project at all reasonable times. Three Rivers conveyed certain equipment to BBM. Williams was relieved from any further responsibility or liability for contracts executed by Three Rivers on the Project. BBM also agreed to hold Three Rivers harmless on any liens filed on the Project. In addition, the contract guaranteed that the cost of erecting, constructing, and completing the Project, including work previously completed by Three Rivers and including a fixed fee of $ 140,000, would not exceed $ 2,451,000. It also provided that upon the availability of $ 140,000 from the Project, BBM would pay Three Rivers $ 119,000 of its original fixed fee of $ 140,000 and would keep the remaining $ 21,000 as BBM's portion of the fixed fee for completion of the Project. *277 The contract further provided for allocation of any profits realized on the sale of the Project between BBM, Three Rivers, and the partners of the Meadows should the cost of completion be below the guaranteed cost of $ 2,451,000. The parties and Williams do not agree as to the characterization or legal effect of the contract. [3]
Williams turned over Three Rivers' books and records to BBM. Bennett continued to maintain the books and records of Three Rivers pertaining to the Project. BBM opened a new, separate, checking account for the Project using the Three Rivers' name. The Project was the only job that Three Rivers had at the time it and BBM entered into the contract. After Three Rivers and BBM entered into the contract, *278 Williams continued to own all of the stock of Three Rivers. However, he stopped using the Three Rivers' name at that time. The Project encountered more problems. Sometime in 1972 the Meadows decided to sell the Project if possible. In May or June of 1972, negotiations to sell the Project began with Bell Tower Properties, Inc. (hereinafter referred to as "Bell Tower"). The Meadows and Bell Tower executed a contract, dated October 26, 1972, (hereinafter referred to as "the Bell Tower contract") to sell the Project for $ 2,925,000. Bell Tower agreed to pay the purchase price as follows: (1) by taking the Project subject to the mortgage in the amount of $ 2,400,000; (2) by delivering a promissory note of $ 125,000, with a maturity date of July 1, 1973, and with interest accruing from and after April 1, 1973; (3) by delivering a promissory note in the amount of $ 100,000, with a maturity date of October 1, 1975, and with interest accruing from and after April 1, 1973; and (4) by posting a letter of credit in the amount of $ 300,000, drawable only upon completion of the Project. Under the Bell Tower contract the Meadows agreed to complete construction on or before March 1, 1973, with *279 provision for extension until June 1, 1973, and with liquidated damages of $ 1,000 [4] per day after the last day of February, 1973. The Meadows agreed to pay the entire cost of the construction of the Project. The partners of the Meadows guaranteed the completion of construction. Closing occurred on November 21, 1972. At closing, the Project was not completed. Bell Tower assigned the Bell Tower contract to Bell Tower Meadows Associates, Ltd. (hereinafter referred to as "Bell Tower Meadows"). Bell Tower Meadows immediately began *280 to complain about progress on the Project and other matters. Requests for extensions of time were rejected and in March 1973 notice was given to the Meadows of default pursuant to the terms of the Bell Tower contract. Bell Tower Meadows refused to pay certain notes and letters of credit to the Meadows and invoked the liquidated damages provision of the Bell Tower contract. Attempts to settle these disputes continued in April, May, and June of 1973. The Meadows exhausted its source of funds on its construction loan agreement and those funds did not provide sufficient monies to complete the Project. In April, May, and June of 1973, the Project was out of funds. The Meadows turned to Roman Design Company (hereinafter referred to as "Roman Design") as a source of funds. Roman Design is a Georgia general partnership organized in September 1970. It has never had a written partnership agreement. Since 1972, Bennett, Busbin, and McGuffey have been its partners, each with a thirty-three and one-third percent ownership interest. [5] Bennett maintained the books and records for Roman Design. Roman Design handled the design of projects, was involved in equipment rentals, and later (sometime *281 after 1971) became a consolidation of the various interests of its partners. Roman Design advanced monies to the Meadows to complete the Project. On their respective books and records Bennett recorded the advances as receivables from the Meadows and payables to Roman Design. In addition, commencing June 27, 1973, and ending February 18, 1975, Roman Design advanced monies to or on behalf of Three Rivers (or BBM doing business as Three Rivers). The parties do not agree as to which entity the funds were advanced. See n. 3, supra. Bennett recorded these advances, totaling $ 88,368.30, [6] on the respective books and records of Roman Design and Three Rivers as receivables from Three Rivers and payables to Roman Design. These advances are in issue in this case, see infra. At the time the advances were made, Bennett was employed by BBM and was authorized to sign Roman Design's checks. Williams did not know that these funds from Roman Design were advanced to Three Rivers *282 or deposited in Three Rivers' bank account. *283 Bennett made the decision for Roman Design to make the advances to Three Rivers. Roman Design is not in the business of loaning money to companies, but it has made some loans to companies in which its partners held an interest. Bennett did not try to borrow money from financial institutions on behalf of Three Rivers before or in lieu of obtaining monies from Roman Design. Three Rivers did not sign any promissory notes to Roman Design for these advances. Three Rivers did not sign any security agreements pledging any collateral to Roman Design as security for the advances. Three Rivers did not sign any agreement to pay Roman Design interest on the advances. Three Rivers did not sign any agreements to repay the advances to Roman Design. In July 1973, the permanent financing was closed with escrows established for certain matters. The Meadows borrowed monies from First National Bank to pay these claims and assigned notes from Bell Tower Meadows to the bank as security. Sometime thereafter, Bell Tower Meadows informed Bennett, Busbin, and Williams that its notes to the Meadows would not be paid, claiming a setoff under the guaranty of Bennett, Busbin, and Williams to complete *284 the Project. Lawsuits were instituted in Alabama and New Jersey between the Meadows and Bell Tower Meadows. First National Bank declared its notes due from the Meadows and instituted suit on the Bell Tower Meadows' notes it held as security on the notes from the Meadows. In August 1973, a settlement was reached in which The Meadows received a payment from Bell Tower Meadows of $ 115,738 which was applied on a portion of the debt the Meadows owed to First National Bank. The Meadows had no funds with which to pay Three Rivers any amount. Amounts were still due and owing for construction costs. On its 1973 partnership return, Roman Design wrote off as a bad debt the monies it had advanced to Three Rivers to that date ($ 82,753). On audit of the 1973 partnership return respondent disallowed this bad debt deduction. The Roman Design partnership then restored the $ 82,753 to its books as a receivable from Three Rivers. In January 1975, Three Rivers filed suit against BBM regarding amounts it claimed were due Three Rivers' as its portion of the fixed fee due under the agreement between Three Rivers and BBM. Roman Design then filed suit in April 1975 against Three Rivers regarding *285 the $ 88,368.30 it claimed was due Roman Design from advances it made to Three Rivers. Three Rivers answered that compliant, denied liability, and filed a third-party complaint against BBM alleging that if Three Rivers were liable to Roman Design then BBM was liable to Three Rivers under the provisions of the contract. BBM answered and denied liability to the third-party complaint. Between 1975 and May 1979, no further activity occurred in court regarding any of this pending litigation among Three Rivers, BBM, and Roman Design. In 1979 the cases appeared on a master calendar or master dismissal list where they were subject to dismissal by the Court because of prolonged inactivity. On May 25, 1979, by mutual agreement, Three Rivers, Roman Design, and BBM voluntarily dismissed their complaints without prejudice. At the time they mutually agreed to dismiss their complaints, the parties felt that, even if judgments were obtained, the judgments would be uncollectable. On its 1975 partnership return Roman Design again wrote off as a bad debt the monies it had advanced to Three River to that date ($ 88,368.30). For 1975 Roman Design also wrote off as a bad debt $ 93,300.69 of receivables *286 from the Meadows. On its 1976 partnership return Roman Design wrote off as a bad debt $ 123,001.19 it had advanced to Lavonia Rama Co. On audit of Roman Design's 1975 and 1976 partnership returns the examining agent proposed that these three bad debt deductions be disallowed. Roman Design filed an appeal with respondent in 1979 on all three of these bad debts adjustments and other adjustments proposed by the examining agent. In 1981, in settlement of this appeal, respondent and Roman Design agreed that Roman Design would be allowed to deduct as bad debts for 1975 the $ 93,300.69 advanced to the Meadows and for 1976 the $ 123,001.10 advanced to Lavonia Rama Co. These amounts are not in issue in this case. Respondent and Roman Design also agreed that Roman Design would not be allowed to deduct for 1975 the $ 88,368.30 advanced to Three Rivers. The parties do not agree as to whether respondent and Roman Design agreed as a part of the settlement of this appeal that the $ 88,368.30 would be deemed to be contributions to capital. [7] In 1981, Bennett, Busbin, and McGuffey individually executed Forms 870 for their own Federal income tax returns for 1975 and 1976 to evidence the above *287 resolution of the dispute pertaining to Roman Design's 1975 and 1976 partnership returns. In 1981, Bennett restored the $ 88,368.30 to Roman Design's books and records as a receivable from Three Rivers. On its 1981 partnership return Roman Design claimed an operating loss of $ 114,779. Included in this loss was an $ 88,368.45 [8] bad debt deduction *288 claimed pertaining to advances made to Three Rivers. Bennett made the decision to deduct the advances as a bad debt on Roman Design's 1981 partnership return. He felt that he had some basis for treating it as a bad debt because the money had been spent and he believed it was a debt to Roman Design. For 1981, Bennett deducted $ 100,000 of the Roman Design operating loss on his individual Federal income tax return; McGuffey deducted $ 14,779 of the loss on his individual Federal income tax return; and Busbin deducted none of the loss. Bennett made the decision as to the manner in which the Roman Design 1981 operating loss would be allocated. The capital account balances at the end of 1981 for Roman Design's partners were as follows: Partner
Capital Account
Bennett
<$ 50,208>
McGuffey
<$ 19,827>
Busbin
$ 49,792 *289 Respondent again disallowed the bad debt deduction pertaining to Three Rivers on audit of the partnership's 1981 return. Three Rivers was in existence in 1981 and at the time of trial. Williams was its sole shareholder and its president. The company, however, was dormant, had no assets, and, at least since its fiscal year ending April 30, 1974, had a negative shareholder's equity of $ 221,000. [9] Three Rivers ceased operations when it went broke on the Project. [10]BBM went out of existence in 1976 or 1977. *290 Respondent issued notices of deficiency to petitioners pertaining to their 1981 individual income tax returns. In the notices issued to them, respondent disallowed deductions claimed by Bennett and McGuffey as each partner's distributive share of Roman Design's 1981 partnership loss to the extent the deduction exceeded $ 4,998.23. The adjustments resulted primarily from the disallowance on Roman Design's partnership return of the bad debt deduction of $ 88,368.30 and a reallocation to all three partners of the reduced partnership loss based upon an equal share of the recomputed loss. In the notice of deficiency issued to petitioners Bennett for 1981 respondent also determined additions to tax under sections 6653(a)(1) and (a)(2). In 1981, Bennett was aware of the rules and regulations regarding bad debt deductions and special allowances of losses. Roman Design asserts that the $ 88,368.30 debt from Three Rivers was worthless in 1975. Roman Design used the cash basis method of accounting for its 1981 partnership return. OPINION Bad debt deduction
Section 166 [11] generally allows deductions for debts which become worthless in the taxable year. Sec. 166(a). To be *291 entitled to the deduction, the taxpayer must prove the existence of a bona fide debtor-creditor relationship which obligates the debtor to pay the taxpayer a fixed or determinable sum of money. A gift or contribution of capital cannot be considered a debt. Sec. 1.166-1(c), Income Tax Regs. With respect to noncorporate taxpayers, the debt must be "created or acquired * * * in connection with" the taxpayer's trade or business. If the debt is not so created or acquired, it is a "nonbusiness debt," and the loss on the worthlessness of the debt is deductible only as a short-term capital loss. Sec. 166(d). *292 Respondent contends that the advances at issue in actuality were contributions of capital of BBM by its owners using Roman Design to advance the funds. Respondent further asserts that, assuming arguendo that the advances were valid loans by Roman Design to Three Rivers, petitioners have failed to meet their burden of proving that the debt became worthless in 1981. Petitioners contend that when Roman Design advanced the funds to Three Rivers, a valid and legitimate debtor-creditor relationship was created. They assert further that there is no basis in fact or law upon which to determine that the advances by Roman Design were contributions to capital to any entity. Petitioners do not contend that the debt [12] became worthless in 1981. They assert that the debt became worthless in 1973 or 1975. Petitioners argue, however, that because of the ongoing dispute with respondent regarding the deductibility of the advances, Roman Design could not take the bad debt deduction until 1981 although it had tried to do so in both 1973 and 1975. Thus, petitioners assert that "If, in fact, the parties agreed in 1981 that the debt could not be taken as a bad debt deduction in 1975 but [Roman *293 Design was] not precluded from [taking] a deduction in a later year then Roman Design Company can only take the loss in the first year after 1975 in event the debt is restored to its books. In this case this was 1981." Petitioners cite no authority for their novel theory. Petitioners argue further that respondent should be estopped from denying that the advances became worthless during 1981 since "year after year petitioners have attempted to take the debt off the books as worthless and has [sic] been required by respondent to place it back on the books." Since we agree with respondent that petitioners have failed to meet their burden of proving that the advances, if valid loans, actually became worthless in 1981, we will consider this matter first as it is dispositive of the entire bad debt deduction issue. For a debt to be deductible, it must become worthless within the taxable year. Sec. 166(a); sec. 1.166-3, [13] Income Tax Regs. Whether a debt became worthless in the taxable year is a question of *294 fact, determined by objective standards, and petitioners have the burden of proof. Perry v. Commissioner,22 T.C. 968, 973 (1954); sec. 1.166-2, Income Tax Regs.; [14] Rule 142(a). *295 Mere belief that a debt is bad is insufficient to support a deduction for worthlessness. Fox v. Commissioner,50 T.C. 813, 822 (1968), affd. in an unreported opinion (9th Cir. 1970, 70-1 USTC par. 9373, 25 AFTR2d 70-891). In order to carry their burden of proof, petitioners must establish that the debt had some value as of the end of 1980 and that it then became worthless by the end of 1981. See Dustin v. Commissioner,53 T.C. 491, 501 (1969), affd. 467 F.2d 47 (9th Cir. 1972). Petitioners presented no evidence showing that the debt had any value as of the end of 1980. In fact, the record here tends to establish that, if in fact valid loans, the advances became worthless at least by 1979, if not earlier. As of April 30, 1974, Three Rivers' liabilities exceeded its assets. Nothing in the record indicates that at any time after that date Three Rivers regained a positive asset position. Moreover, Three Rivers (as did BBM) ceased operations some years before the beginning of 1979. In 1979, representatives of Three Rivers, BBM, and Roman Design believed that any judgment each one might receive against the others would *296 prove uncollectible and, therefore, they agreed to dismiss their complaints, or third-party complaint, against each other. Nothing in the record shows that Roman Design could have collected anything from Three Rivers or BBM when the complaints or third-party complaint were dismissed. Thus, petitioners have failed in their burden of proving that the advances had any value as of the end of 1980 and then became worthless in 1981. Petitioners' contention that respondent should be estopped from arguing that the advances did not become worthless in 1981 is without merit. The Court will not lightly conclude that respondent is estopped from determining a deficiency. Boulez v. Commissioner,76 T.C. 209, 215 (1981), affd. 810 F.2d 209 (D.C. Cir. 1987), cert. denied 484 U.S. 896 (1987); Estate of Emerson v. Commissioner,67 T.C. 612, 617 (1977). Nonetheless, if the elements of estoppel are proved, justice requires that the Court apply it. See Lignos v. United States,439 F.2d 1365, 1368 (2d Cir. 1971). [15] The record here does not support the application of estoppel against respondent however. *297 Petitioners cite no authority for their assertion that the contest with respondent pertaining to the bad debt deduction claimed on Roman Design's 1975 partnership return precluded Roman Design from attempting to deduct the bad debt in a year earlier than 1981 and we know of none. Moreover, petitioners have failed to prove that they suffered actual harm as a result of respondent's actions or representations. Petitioners could have filed protective claims for the intervening years between 1975 and the resolution of the administrative appeal in order to preserve the statute of limitations for filing claims for refund for those years. [16] Petitioners also could have contested respondent's determination for 1975 in this Court instead of settling the issue with respondent as they did. Moreover, the Forms 870 did not preclude petitioners from filing claims for refund and seeking recovery in the Court of Claims or the appropriate District Court. Thus, petitioners have failed to establish that they satisfy the elements for estoppel to be applied. Their estoppel argument is totally without foundation and respondent is not estopped from arguing that the debt did not become worthless in *298 1981. Since we have determined that, even if the advances were valid loans, petitioners have failed to establish that the debt became worthless in 1981, we need not reach respondent's contention that the advances were in fact contributions to capital. We hold for respondent on the bad debt deduction issue. Disproportionate allocation of partnership operating loss
[17]
*299 Roman Design claimed an operating loss of $ 114,779 on its 1981 partnership return. For 1981, Bennett deducted $ 100,000 of the Roman Design operating loss on his individual Federal income tax return; McGuffey deducted $ 14,779 of the loss on his individual Federal income tax return; Busbin deducted none of the loss. Respondent contends that this disproportionate allocation of the partnership operating loss is without substantial economic effect. Petitioners assert on the other hand that, although the tax consequences were considered by them, the disproportionate allocation did have substantial economic effect because the allocation actually affected the partners' capital accounts. For the following reasons we agree with respondent. Partners must report their distributive shares of partnership income, gain, loss, deduction, or credit. Sec. 702(a). Section 704(a) provides that a "partner's distributive share of income, gain, loss, deduction, or credit shall, except as otherwise provided in this chapter, be determined by the partnership agreement." However, section 704(b)(2) provides that if "the allocation to a partner under the agreement of income, gain, loss, deduction, or *300 credit (or item thereof) does not have substantial economic effect," then it will be disregarded, and the partner's distributive share "shall be determined in accordance with the partner's interest in the partnership (determined by taking into account all facts and circumstances)." Section 704 was amended by section 213(d) of the Tax Reform Act of 1976 (Pub. L. 94-455, 90 Stat. 1520, 1548). The amendment is effective for partnership years beginning after December 31, 1975. The joint committee's explanation of the amendments to section 704 indicated that, in determining whether partnership allocations had substantial economic effect, the partners' rights to distribution of capital on liquidation were to be considered. Staff of Joint Committee on Taxation, General Explanation of the Tax Reform Act of 1976, 1976-3 C.B. (Vol. 2) 107 n. 6. The purpose underlying the amendments was to permit partnerships to use special allocations for bona fide business purposes, but not for tax avoidance purposes. General Explanation of the Tax Reform Act of 1976, supra; Gershkowitz v. Commissioner,88 T.C. 984, 1018-1019 (1987) (Court reviewed). The final regulations *301 promulgated under section 704(b) were filed on December 24, 1985, and published on December 31, 1985. T.D. 8065, 50 Fed. Reg. 53420 (1985), 1986-1 C.B. 254. The final regulations provide that the determination of whether an allocation has substantial economic effect involves a two-part test. Under the first part of the test, the allocation must have economic effect. Under the second part, the economic effect of the allocation must be substantial. The final regulations are effective generally for partnership taxable years beginning after December 31, 1975. However, for partnership taxable years beginning after December 31, 1975, but before May 1, 1986 (or before January 1, 1987, with respect to special allocations of nonrecourse debts), a special allocation that does not satisfy their requirements nonetheless will be respected for purposes of the final regulations if such allocation has substantial economic effect as interpreted under the relevant case law and the legislative history of the Tax Reform Act of 1976, and the provisions of this paragraph in effect for partnership taxable years beginning before May 1, 1986. Sec. 1.704-1(b)(1)(ii), Income Tax Regs. Under *302 the final regulations, the determination of substantial economic effect is set forth as an annual test. Sec. 1.704-1(b)(2)(i), Income Tax Regs. However, they also provide that the obligation to restore a deficit capital account balance attributable to a special allocation must be provided for in the partnership agreement "throughout the full term of the partnership" (section 1.704-1(b)(2)(ii)(b), Income Tax Regs.), unless the allocation otherwise is deemed to have economic effect. See secs. 1.704-1(b)(2)(ii)(c), (d), and (i), Income Tax Regs. Moreover, the final regulations were amended as of Sept. 9, 1986, T.D. 8099, 51 Fed. Reg. 32061 (1986), 1986-2 C.B. 84. As amended, the final regulations would apply a hypothetical liquidation test as of the end of each partnership taxable year. However, a special allocation would be deemed to have economic effect in any given year provided that in the event of a liquidation of the partnership as of the end of the taxable year in issue or any future partnership taxable year the same economic results would be produced "regardless of the economic performance of the partnership." Sec. 1.704-1(b)(2)(ii)(i), Income Tax Regs. See also *303 Elrod v. Commissioner,87 T.C. 1046, 1086 n. 23 (1986). [18]
Since the instant case involves a taxable year beginning before May 1, 1986, the final regulations in effect do not apply here. Applying the relevant case law, the legislative history of the Tax Reform Act of 1976, and the prior regulations, we find that the special allocation lacks economic effect under such criteria and is not to be respected. Petitioners bear the burden of proving that the special allocation has "'substantial economic effect', i.e., whether the allocation may actually affect the dollar amount of * * * [their shares] of the total partnership income or loss independently of tax consequences." S. Rept. 94-938 (1976), Pub. L. 94-455, 90 Stat. 1520, Tax Reform Act of 1976, 1976-3 C.B. (Vol. 3) 49, 138; Rule 142(a); Ogden v. Commissioner,84 T.C. 871, 884 (1985), *304 affd. 788 F.2d 252 (5th Cir. 1986). The substantial economic effect test requires a determination of whether the partner to whom the item is specially allocated for tax purposes also bears the economic burdens and benefits of that specially allocated item. Harris v. Commissioner,61 T.C. 770, 786 (1974); Orrisch v. Commissioner,55 T.C. 395, 403 (1970), affd. per curiam by an unreported opinion (9th Cir. 1973, 31 AFTR2d 73-1069). In order to have substantial economic effect, a partner's allocation must be reflected in his or her capital account, and, in the event of a partnership liquidation, the liquidation proceeds must be distributed in accordance with the capital account balances. Moreover, where a partner's capital account reflects a deficit, he or she must have the obligation upon liquidation to restore the deficit. Absent such an obligation, the other partner or partners would have to bear part of the economic cost of the special allocations that resulted in the deficit capital account. Ogden v. Commissioner,84 T.C. at 884-885; Goldfine v. Commissioner,80 T.C. 843, 852 (1983). *305 The absence of express language in the partnership agreement of an obligation upon liquidation to restore a deficit in a partner's capital account is not necessarily fatal to the validity of a special allocation. Elrod v. Commissioner,87 T.C. at 1085. Thus, where the taxpayers/partners' capital accounts always maintain positive account balances, no partner would bear more than his share of the economic cost of the loss allocation and the absence of an obligation to restore a capital account deficit upon liquidation alone would not invalidate the allocation.[19]
As of the end of 1981, as a result of the disproportionate allocation of Roman Design's 1981 operating loss, both Bennett and McGuffey had negative capital account balances. Therefore, had Roman Design liquidated while Bennett and/or McGuffey retained the deficit capital account balances, and if Bennett and McGuffey were not required upon liquidation to restore the deficit, Busbin would have had to bear part of the economic cost of the special allocation. Roman Design *306 has no written partnership agreement. The testimony relating to the terms of the partnership agreement as of the end of 1981 pertaining to liquidation of the partnership at a time when one or more of the partners' capital accounts had a negative balance is inconclusive. Consequently, we are unable to conclude from the record here that, as of the end of 1981, Roman Design's partners had agreed that the partners would be required to restore any deficit in their capital accounts upon liquidation of the partnership. Thus, we cannot conclude that the special allocation here had substantial economic effect. Petitioners have the burden of proof on this issue and have failed to carry their burden. We have considered petitioners other arguments and find them unpersuasive. We hold for respondent on this issue. Additions to Tax
Respondent also determined additions to tax under sections 6653(a)(1) and (a)(2) in the notice of deficiency for 1981 issued to petitioners Bennett. For 1981, section 6653(a)(1) [20] provided that, if any part of any underpayment of tax was due to negligence or intentional disregard of rules and regulations, there shall be added to the tax an amount equal *307 to five percent of the underpayment. Section 6653(a)(2) provided that if any part of an underpayment of tax was due to negligence or intentional disregard of the rules and regulations, there shall be added to the tax, in addition to the five-percent addition already provided by section 6653(a)(1), an amount equal to fifty percent of the interest payable under section 6601 with respect to the portion of such underpayment which is attributable to negligence. The addition to tax under section 6653(a)(2) was imposed for the period beginning on the last day prescribed by law for payment of such underpayment. Respondent's determination is presumed correct and the burden is on petitioners to prove these additions are erroneous. Enoch v. Commissioner,57 T.C. 781, 802 (1972). *308 Under section 6653(a), negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). Petitioners, relying on Kilborn v. Commissioner,29 T.C. 102 (1957), modified on other issues in an unreported opinion (5th Cir. 1958, 2 AFTR2d 5812, 58-2 USTC par. 9847), assert that the addition to tax for negligence or intentional disregard of rules or regulations should not be sustained because respondent made no mention of this addition to tax in the "issues" section of his pretrial memorandum and failed to specify any basis for the addition to tax in the notice of deficiency. Thus, petitioners conclude, respondent has failed to make out any prima facie case for the additions to tax under sections 6653(a)(1) and (a)(2). Respondent contends that his counsel inadvertently failed to mention the addition to tax for negligence or intentional disregard of rules or regulations in his pretrial memorandum. However, respondent asserts, the Kilborn case is factually distinguishable from the instant case because here respondent *309 offered evidence at trial regarding the negligence addition, respondent addressed and explained the addition to tax in his brief, and petitioners knew it was an issue and specifically questioned Bennett about the addition at trial. Respondent contends further that since his determination as set forth in the notice of deficiency contained the additions to tax under sections 6653(a)(1) and (a)(2), his determination has a presumption of correctness until petitioners rebut it. Welch v. Helvering, supra; Rule 142(a). We agree with respondent that the facts here are easily distinguishable from those in the Kilborn case. In Kilborn, the addition to tax for negligence or intentional disregard of rules or regulations was first made an issue by the pleadings. However, the Court was never advised with any certainty as to what constituted the negligence or disregard of regulations on which respondent based his determination. Moreover, respondent's counsel made no mention of the matter in his opening statement, nor did he state a basis for the addition to tax any place in the record or in his briefs. Assuming a basis for the addition to tax to rebut respondent's determination, *310 the taxpayer's counsel presented evidence and discussion on brief relating to the assumed alleged negligent acts. On the basis of the record in Kilborn, particularly in light of respondent's complete failure to make any representations in rebuttal of the taxpayer's evidence and argument as to just what were the acts of negligence supplying the basis for respondent's determination, we sustained the taxpayer. Kilborn v. Commissioner,29 T.C. at 111-112. In the instant case, the addition to tax was included in the notice of deficiency. Additionally, at the trial respondent's examining agent testified that he determined the addition to tax for negligence or intentional disregard of rules or regulations because of an adjustment made to Roman Design's partnership return for some improper accrual of rental expenses (an agreed issue) and the adjustment for the improper allocation of Roman Design's partnership loss. The examining agent further testified that in determining the addition to tax he took into consideration Bennett's experience as a certified public accountant. In his brief, moreover, respondent set forth arguments for sustaining the addition to tax on *311 the basis that, on his own Federal income tax return for 1981, Bennett had overstated his distributive share of Roman Design's loss by improperly deducting accrued rental expenses even though Roman Design used the cash basis method of accounting and by improperly allocating Roman Design's 1981 partnership loss among the partners in violation of section 704. In their reply brief, petitioners did not respond to respondent's arguments pertaining to the additions to tax. Therefore, we find petitioners' reliance on Kilborn to be inapposite. [21]
Bennett is liable for the section 6653(a)(1) addition to tax if "any part of [the] underpayment * * * is due to negligence or intentional disregard of rules or regulations * * *." (Emphasis added.) The only evidence petitioners presented regarding the addition to tax for negligence or intentional disregard of rules or regulations is contained in the following exchange between Bennett and petitioners' counsel: Graham: In 1981, *312 were you aware of the rules and regulations regarding bad debt deductions and special allowances of losses? Bennett: In 1981, yes. Graham: The Government -- I am going to refer, again, now to Joint Exhibit 72-BT. In that Exhibit it is stated on your Notice of Deficiency Statement, "It is determined that the underpayment of tax for 1981 in the amount of $ 22,985.21 is due to negligence or intentional disregard of rules and regulations." Mr. Bennett, did you intentionally disregard rules and regulations? Bennett: No, I did not. Graham: In your opinion, was an underpayment of tax due to your negligence? Bennett: No. Graham: What is your belief today regarding the deduction that was taken? Bennett: It was proper. Graham: What is your belief today regarding the disproportionate allocations? Bennett: That, that was proper. Bennett's self-serving statements that the underpayment of tax was not due to negligence and that he believes the deduction and special allocation were proper are not sufficient to carry his burden of proof. According to respondent's examining agent, one basis for the addition to tax was that Bennett improperly deducted on Roman Design's partnership *313 return for 1981 accrued rental expenses incurred prior to 1981 which covered a period from 1979 through 1981 even though Roman Design used the cash basis method of accounting for its partnership return. This adjustment is not in issue in this case and the parties presented no further explanation of the deduction to the Court. Therefore, we can only conclude that the adjustment is correct. Petitioners have the burden of proof on this issue. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). It is clear from the record here that Bennett determined which deductions would be claimed on Roman Design's partnership returns. Petitioners presented no evidence or argument at trial explaining why Roman Design was not negligent in deducting accrued rental expenses on its 1981 partnership return. Bennett is a certified public accountant and he maintained the books and records of Roman Design for 1981. Thus, he must have known that part of Roman Design's 1981 operating loss included an improper deduction of accrued rental expenses. Based on this record, we hold that petitioners have failed to carry their burden of proving that Bennett used due care in deducting his distributive *314 share of Roman Design's putative loss. Therefore, since at least some portion of the underpayment of tax is attributable to negligence or intentional disregard of rules or regulations, we sustain against petitioners Bennett the addition to tax under section 6653(a)(1). The section 6653(a)(2) addition to tax is only applicable to "the portion of the underpayment described in paragraph (1) which is attributable to negligence or intentional disregard referred to in paragraph (1) * * *." The notice of deficiency, however, shows that respondent determined the section 6653(a)(2) addition to tax on the entire underpayment of tax even though a portion of the underpayment for petitioners Bennett is attributable to an adjustment of the distributive share of the net loss from a partnership known as Pine Valley Associates. This adjustment is not in issue in this case and the record is silent as to the basis for the adjustment. Respondent does not allege anywhere in the record, however, that Bennett was negligent or intentionally disregarded rules or regulations in claiming a deduction for his share of the loss relating to Pine Valley Associates. Rather, respondent specifically gives as his *315 basis for the section 6653(a)(1) addition to tax only Bennett's deduction of his distributive share of Roman Design's operating loss. Respondent, by his own specificity, in effect has conceded that petitioners Bennett were not negligent in deducting their share of the Pine Valley Associates' loss. Therefore, on the basis of this record, we find that petitioners Bennett are not liable under section 6653(a)(2) for the portion of the underpayment of tax attributable to the adjustment relating to Pine Valley Associates. We held above that petitioners did not prove that Bennett used reasonable care in deducting his share of Roman Design's operating loss, at least as to that portion of the loss attributable to the deduction of accrued rental expenses. Therefore, petitioners Bennett are liable for the addition to tax under section 6653(a)(2) at least for the portion of the underpayment attributable to that adjustment. The balance of Roman Design's 1981 operating loss is attributable to its deduction of the $ 88,368.30 it advanced to Three Rivers, see supra. We have held that petitioners have not proved that these advances, if in fact valid loans, had some value as of the end of *316 1980 and then became worthless in 1981. In fact, Roman Design admits that the debt actually became worthless in a year earlier than 1981 and the record here supports that contention. Petitioners have not set forth any reasonable basis in fact or law for Roman Design deducting the advances in 1981 as a bad debt deduction. Bennett made the decision to deduct on Roman Design's 1981 partnership return the advances to Three Rivers as a bad debt. As an experienced certified public accountant, Bennett should have known that the advances were not deductible for 1981. On the basis of the record here, we find that Bennett did not exercise due care in deducting his share of Roman Design's operating loss attributable to this bad debt deduction. Bennett should have known that Roman Design's putative loss for 1981 was overstated and that he was not entitled to claim as his distributive share of that loss the amount he deducted on his 1981 Federal income tax return. Therefore, we hold that petitioners Bennett are liable for the addition to tax under section 6653(a)(2) for the portion of the underpayment attributable to the deduction of Bennett's share of Roman Design's putative operating loss *317 but they are not liable for the addition to tax under section 6653(a)(2) for the portion of the underpayment attributable to their deduction of their share of Pine Valley Associates' loss. To reflect the foregoing, Decision will be entered for the respondent in docket No. 2541-85.
Decision will be entered under Rule 155 in docket No. 2542-85.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest due on $ 22,985.21 ↩
2. Other adjustments determined by respondent which are included in the deficiency amounts reflected above were not raised in petitioners' petitions and are not in issue in these consolidated cases.↩
3. Petitioners contend that the contract is a "construction management contract" in which BBM agreed to see to the completion of the Project on behalf of Three Rivers. Respondent argues that by the terms of the contract, BBM stepped into the shoes of Three Rivers as the contractor of the Project and agreed to complete the Project while operating as Three Rivers. According to Williams, BBM assumed the contract between the Meadows and Three Rivers.↩
4. The parties stipulated that the contract between the Meadows and Bell Tower provided for liquidated damages of $ 1,000 per day after the last day of February, 1973, should the Project not be completed on or before March 1, 1973. We note that the copy of the "Agreement For Sale Of Real Property and Development of Apartment Complex" (without referenced exhibits) between the Meadows and Bell Tower as presented at trial contains no such liquidated damages provision. The parties do not explain this discrepancy, and we do not choose to resolve it. We will accept the existence of the liquidated damages provision as stipulated to by the parties.↩
5. In 1970 and 1971, the partners of Roman Design and their partnership percentages were: Williams (54.933 percent); Bennett (15.022 percent); Busbin (15.022 percent); and William Calloway (15.022 percent).↩
6. The following checks were drawn on Roman Design's checking account for this purpose and recorded in a receivables account: Date
Payee
Amount
June 27, 1973
Three Rivers
$ 10,000.00
July 5, 1973
Three Rivers
2,000.00
July 6, 1973
Three Rivers
6,500.00
July 10, 1973
Three Rivers
3,800.00
July 16, 1973
First National Bank
716.70
July 27, 1973
Three Rivers
800.00
August 7, 1973
Three Rivers
6,000.00
August 15, 1973
Three Rivers
1,600.00
August 24, 1973
First National Bank
1,116.18
September 6, 1973
Three Rivers
2,000.00
September 27, 1973
Three Rivers
800.00
October 11, 1973
Three Rivers
5,000.00
October 29, 1973
Dalraida Nursery
1,585.17
November 14, 1973
Three Rivers
9,600.00
December 3, 1973
Three Rivers
1,600.00
December 14, 1973
Three Rivers
1,000.00
December 19, 1973
Three Rivers
2,000.00
January 7, 1974
Three Rivers
400.00
January 7, 1974
Three Rivers
600.00
February 15, 1974
Three Rivers
200.00
February 20, 1974
Three Rivers
105.00
March 5, 1974
Three Rivers
1,010.00
March 14, 1974
Three Rivers
500.00
June 19, 1974
Three Rivers
300.00
February 18, 1975
Three Rivers
2,500.00
Total
$ 61,733.05
In addition, this same receivables account contains two other entries, as follows: ↩
Date
Description
Amount
July 23, 1973
NCB-Bank wire-mail boxes
$    512.50
December 31, 1973
Cashiers check
issued by note
26,122.75  Total receivables shown in this account
$ 88,368.30
7. Petitioners contend that they never agreed that these advances would be treated as contributions to capital and that the settlement agreement (on Forms 870) executed by the parties for 1975 and 1976 makes no provision for treating the $ 88,368.30 as contributions to capital. Respondent asserts that the Appeals Officer's Supporting Statement explaining the settlement reflects that Roman Design agreed to have the disallowed bad debt deduction treated as contributions to capital and that the Revenue Agent's Report and Roman Design's Protest show that the basis for the disallowance was not that the debt was not worthless in 1975 but that the advances were contributions to capital; therefore, respondent argues, when Roman Design agreed to the concession of this issue, it was conceding that the advances were contributions to capital.↩
8. The record establishes that this deduction represents the same $ 88,368.30 which Roman Design had deducted on its 1975 partnership return as a bad debt from Three Rivers. The record does not explain why an additional 15 cents is included in the amount deducted for 1981. We assume it resulted from a recording error. Hereinafter we will refer to the amount of the deduction as $ 88,368.30, the amount proved actually advanced.↩
9. According to financial statements for Three Rivers prepared by Ben E. Whittington, the accountant for Roman Design, BBM, and the Meadows, Three Rivers had the following assets, liabilities, and stockholder's equity as of April 30, 1974: ↩
Assets
Current Assets: Cash
$   686   Accounts receivable - affiliated companies
7,058   Accounts receivable - other
854   Cost of the Meadows job in process in
excess of billings
26,400   Deposit due from Jefferson Land Title
Services Co., Inc.
2,838   Total current assets
$ 37,836   Other Asset:
Stock - 500 shares of Preferred Land
Corporation
$    760   Total
$ 38,596   Liabilities and Stockholder's Equity
Current Liabilities:
Accounts payable - trade
$  3,161   Note payable - First National Bank
16,572   Account payable-Williams Construction Co.
3,439   $ 23,172   Other Liabilities:
Account payable - Roman Design Co.
$  88,154  Account payable - Charles S. Williams
148,902  Total other liabilities
$ 237,056  Stockholder's Equity:
Capital stock (70 shares issued and
outstanding)
$   7,000 Retained earnings
(228,632)
Total stockholder's equity
$ (221,632)
Total
$   38,596 10. It is not clear from this record when the Project was completed; however, it appears that construction was substantially completed by March 1, 1973. According to Williams, the financial statements prepared by Ben E. Whittington, see n.9, supra,↩ were prepared to give everybody a summary of the status of Three Rivers after the completion of the Project.
11. Section 166 provides in pertinent part as follows: SEC. 166. BAD DEBTS. (a) General Rule. -- (1) Wholly worthless debts. -- There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction. -- For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *↩
12. We use the word "debt" for convenience only. Its use should not be construed as carrying any conclusion as to the legal effect of the transactions involved here.↩
13. Sec. 1.166-3, Income Tax Regs., provides: Sec. 1.166-3 Partial or total worthlessness -- (a) Partial worthlessness. -- (1) Applicable to specific debts only. A deduction under section 166(a)(2) on account of partially worthless debts shall be allowed with respect to specific debts only. (2) Charge-off required. (i) If, from all the surrounding and attending circumstances, the district director is satisfied that a debt is partially worthless, the amount which has become worthless shall be allowed as a deduction under section 166(a)(2) but only to the extent charged off during the taxable year. (ii) If a taxpayer claims a deduction for a part of a debt for the taxable year within which that part of the debt is charged off and the deduction is disallowed for that taxable year, then in a case where the debt becomes partially worthless after the close of that taxable year, a deduction under section 166(a)(2) shall be allowed for a subsequent taxable year but not in excess of the amount charged off in the prior taxable year plus any amount charged off in the subsequent taxable year. In such instance, the charge-off in the prior taxable year shall, if consistently maintained as such, be sufficient to that extent to meet the charge-off requirement of section 166(a)(2) with respect to the subsequent taxable year. (iii) Before a taxpayer may deduct a debt in part, he must be able to demonstrate to the satisfaction of the district director the amount thereof which is worthless and the part thereof which has been charged off. (b) Total worthlessness. If a debt becomes wholly worthless during the taxable year, the amount thereof which has not been allowed as a deduction from gross income for any prior taxable year shall be allowed as a deduction for the current taxable year. ↩
14. Sec. 1.166-2, Income Tax Regs., provides in pertinent part: Sec. 1.166-2 Evidence of worthlessness. -- (a) General rule. In determining whether a debt is worthless in whole or in part the district director will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor. (b) Legal action not required. Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for purposes of the deduction under section 166. (c) Bankruptcy. -- (1) General rule. Bankruptcy is generally an indication of the worthlessness of at least a part of an unsecured and unpreferred debt. (2) Year of deduction. In bankruptcy cases a debt may become worthless before settlement in some instances; and in others, only when a settlement in bankruptcy has been reached. In either case, the mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless, shall not authorize the shifting of the deduction under section 166 to such later year. * * * ↩
15. See Wright v. Commissioner,T.C. Memo. 1986-183↩.
16. We note further that where a claim involves the deductibility of a bad debt the general three year limitation for filing a claim for refund does not apply. Rather, the claim for refund may be filed within seven years from the due date of the return for the year of the claim without regard to extension. Sec. 6511(d)(1). Therefore, in 1981, when petitioners executed the Forms 870 for their 1975 tax years, the statute of limitations for deducting a bad debt had not expired for calendar years 1974 and after.↩
17. It is not clear from this record whether we need to reach this issue in light of our resolution of the bad debt deduction issue. As petitioners phrase the issues, we need not reach the disproportionate allocation issue if we find, as we have, that the $ 88,368.30 which Roman Design claimed as a bad debt deduction on its 1981 partnership return is not allowable. As respondent phrases the issues, we would need to address the disproportionate allocation issue regardless of the manner in which we resolve the bad debt deduction issue. Even after the disallowance of the bad debt deduction and other adjustments not in issue in this case, respondent determined that Roman Design incurred an operating loss for its 1981 year. On audit of petitioners' individual income tax returns for 1981, respondent allowed Bennett and McGuffey each a deduction of $ 4,998.23 as their proportionate distributive share of Roman Design's 1981 operating loss, as adjusted ($ 14,994.68 in total). Thus, if the partnership agreement does provide for the special allocation of Roman Design's operating loss as alleged by petitioners, respondent allocated the loss contrary to the agreement and it would seem that the issue still remains in the case. Furthermore, the disproportionate allocation of Roman Design's operating loss is a basis for respondent's assertion against Bennett of the addition to tax for negligence or the intentional disregard of rules or regulations, see infra.↩ Since the parties do not agree on whether this issue remains in the case, Roman Design incurred an operating loss for 1981, and the disproportionate allocation of Roman Design's operating loss may impact upon the addition to tax issue, we conclude that the disproportionate allocation is still in issue and we will address the issue.
18. The final regulations were further amended effective as of Dec. 29, 1988, and temporary regulations were promulgated in, T.D. 8237, 53 Fed. Reg. 53140 (1988), 1989-5 I.R.B. 4↩, concerning the treatment of partnership liabilities and the allocation of deductions attributable to nonrecourse debt.
19. See Frink v. Commissioner,T.C. Memo. 1984-669; Dibble v. Commissioner,T.C. Memo. 1984-589↩.
20. For 1981, secs. 6653(a)(1) and (a)(2) provided as follows: SEC. 6653. FAILURE TO PAY TAX. (a) Negligence or Intentional Disregard of Rules and Regulations with Respect to Income, Gift, or Windfall Profit Taxes. -- (1) In general. -- If any part of any underpayment (as defined in subsection (c)(1) of any tax imposed by subtitle A, by chapter 12 of subtitle B or by chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. (2) Additional amount for portion attributable to negligence, etc. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to the negligence or intentional disregard referred to in paragraph (1), and (B) for the period beginning on the last date prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax.↩
21. See also Van Dyke v. Commissioner,T.C. Memo. 1983-190 n. 5; Beran v. Commissioner,T.C. Memo. 1980-119; Lysyj v. Commissioner,T.C. Memo. 1980-48↩.